### AMERICAN LIFE INSURANCE COMPANY, Plaintiff,

v.

### Carlos D. PARRA; ASIAT, S.A.; and The Parkway Corporation, Defendants.

### No. Civ.A. 98–401–RRM.

United States District Court, D. Delaware.

Oct. 14, 1999.

Lawrence C. Ashby, Stephen E. Jenkins, Regina A. Iorii, Ashby & Geddes, Wilmington, Delaware; Stuart A. Krause, Zeichner, Ellman & Krause, New York City; Michael T. Sullivan, Marc A. Lebowitz, Piliero Goldstein Jenkins & Hall, New York City, for plaintiff.

Norman L. Pernick, Michael F. Bonkowski, Mark Minuti, Saul, Ewing, Remick & Saul, Wilmington, Delaware; Hector Torres, Harold G. Levison, Cindy Caranella

Kelly, Kasowitz, Benson, Torres & Friedman LLP, New York City, for defendants.

## OPINION

McKELVIE, District Judge.

This is a contract case. Plaintiff, American Life Insurance Company ("ALICO"), is a Delaware corporation. Defendants, Carlos D. Parra, ASIAT, S.A. and The Parkway Corporation, are former ALICO agents. Parra is a citizen of the Republic of Argentina. ASIAT and Parkway are corporations organized under the laws of the Republic of Uruguay.

On July 31, 1996, Parra and ASIAT initiated an arbitration proceeding against ALICO, alleging that ALICO breached its agreements with Parra and ASIAT. ALICO filed a complaint in this court on July 9, 1998, to bar the arbitration with respect to certain claims. ALICO contends that an October 1994 General Release entered into between ALICO and defendants precludes arbitration. Therefore, ALICO seeks a declaration that the General Release and related issues are non-arbitrable.

From January 11, 1999 to January 13, 1999, the court held a jury trial on defendants' affirmative defenses that the General Release is void for duress and fraud. On January 15, 1999, the jury returned its verdict, finding the General Release void for duress and fraud.

During trial, ALICO moved for judgment as a matter of law on the issues of fraud and duress. On January 27, 1999, ALICO renewed its motion for judgment as a matter of law. Alternatively, ALICO moved for a new trial. This is the court's decision on the motions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following testimony and evidence were presented at trial.

### A. Background on the Parties and Procedural Status of the Case

From 1977 to 1991, Parra sold ALICO's International Dollar Business ("IDB") policies in Argentina, first as an agent, then as a master general agent for ALICO. IDB policies are offshore policies, which means they are policies offered in a country by a foreign insurer and are not locally licensed. As a master general agent, Parra supervised a network of approximately 250 agents.

On November 1, 1991, Parra and ALICO entered into a Supervising Master General Agent's Agreement (the "SMGA Agreement"), pursuant to which ALICO appointed Parra a supervising master general agent. The SMGA Agreement provided for arbitration of all issues arising under the agreement.

In the SMGA Agreement, Parra agreed to sell, and to contract directly with agents and brokers to sell, ALICO's IDB policies. Parra agreed to supervise the agents and brokers, and to pay all operating expenses. ALICO agreed to pay commissions and bonuses to Parra for active policies according to schedules set forth in the SMGA Agreement. ALICO agreed to pay Parra a productivity bonus based upon the first year premiums that Parra and his network of agents collected. ALICO also agreed to pay Parra a persistency bonus based upon the renewal premiums they collected. ALICO and Parra agreed that either party could terminate the agreement without cause upon 90 days written notice. ALICO agreed to pay Parra any commissions or bonuses on policies remaining in force if it terminated the agreement without cause.

Defendants allege that in 1992, Parra and his agency network produced more than five million dollars in IDB premiums. During the year, Alex Fernandez, the president of the Latin American Life Insurance Division of ALICO, told some of Parra's agents that ALICO planned to terminate the IDB business. According to Fernandez, ALICO would form a subsidiary in Argentina called ALICO Argentina

to market a new line of locally-licensed policies in Argentina. Locally-licensed insurance products are referred to as "local insurance." They differ from offshore products like IDB, which are not locally licensed.

In an August 2, 1993 letter, J. Douglas Azar, ALICO's president and chief operating officer, informed Parra that ALICO was terminating the SMGA Agreement without cause. Azar wrote that ALICO could no longer pay Parra the current persistency bonus and earn a profit, but that ALICO planned to offer Parra a new contract with a modified bonus schedule. Azar asserted that ALICO would continue to pay Parra the current persistency bonus for his portfolio of active policies pursuant to the terms of the terminated agreement.

In 1994, Parra formed Parkway to operate as a general managing agent selling offshore life insurance products for ALICO and another company, Pan American Insurance Company. Parra's partners in Parkway were Maria Noel Ache, Federico Grupe and Jorge Patalagoity, all of whom were master general agents in Parra's original IDB network.

Around October 1994, Parra met with Fernandez to discuss releasing four of the master general agents in his network: Juan Carlos Garcia, Saul Krivopisk, Sancho Pagano and Eduardo Parra. At this meeting, Fernandez told Parra that ALICO planned to terminate its IDB business by the end of 1994.

On October 1, 1994, Parra, acting on his own behalf and for ASIAT/Parkway, signed the General Release at ALICO's office in Wilmington, Delaware. Pursuant to the agreement, Parra and ASIAT/Parkway agreed to release the four master general agents, Garcia, Krivopisk, Pagano and Eduardo Parra, so that they could contract directly with ALICO Argentina. Parra and ASIAT/Parkway agreed to release any claims to commissions or bonuses for policies sold by the four agents after October 1, 1994, and agreed to release all claims concerning the agents "arising out of and in anyway relating to" the SMGA Agreement. In exchange, ALICO agreed to pay Parra and ASIAT/Parkway $127,-292.30, which represents ten months of first-year commissions that Parra would earn from the agents. The agreement states that Parra would receive additional payments based upon earnings for two months of first-year commissions yet to be calculated.

In 1994, ALICO Argentina, a newly-formed, wholly-owned subsidiary of ALICO, started selling a new line of policies in Argentina. ALICO also continued to sell its IDB policies in Argentina. Defendants allege that since 1994, ALICO has actively solicited Parra's most successful agents to work for ALICO Argentina. Defendants allege that since then, ALICO has delivered inadequate service to Parra's IDB policyholders and has paid his agents' commissions late. Defendants contend that ALICO induced Parra's former agents to convince Parra's policyholders to reissue their policies with ALICO Argentina, usurping Parra's persistency bonus.

Pursuant to the terms of the SMGA Agreement, on July 31, 1996, Parra and ASIAT initiated arbitration proceedings against ALICO. In their Statement of Claim, Parra and ASIAT allege that ALICO breached the SMGA Agreement and intentionally interfered with Parra's agency network and prospective business opportunities by terminating the agreement without cause. They allege that ALICO breached oral agreements and fiduciary duties, and unjustly enriched itself by destroying Parra's agency network and by inducing ALICO Argentina to solicit his agents and brokers.

On July 9, 1998, ALICO filed this action seeking to enjoin Parra, ASIAT and Parkway from arbitrating disputes arising under the General Release. At the same time, ALICO filed a motion for a temporary restraining order and preliminary injunction. On July 27, 1998, this court heard oral argument on the motion for a

temporary restraining order, which it declined to grant.

On July 31, 1998, Parra, ASIAT and Parkway filed their answer. They allege that the General Release is void because ALICO fraudulently induced Parra to execute the release. Parra, ASIAT and Parkway also allege that the General Release is void because ALICO used duress and economic coercion to force Parra to execute the release.

On October 29, 1998, the court issued a preliminary injunction enjoining defendants from arbitrating issues arising out of the General Release. *American Life Ins. Co. v. Parra,* 25 F.Supp.2d 467 (1998).

On January 11, 1999 through January 13, 1999, the court held a jury trial on defendants' affirmative defenses that the General Release is void for fraud and duress.

### B. *The Defendants' Case In Chief*

At the January 1999 jury trial, defendants called Parra as their first witness. Parra testified that he helped set up ALICO's IDB business in Argentina as a master general agent. Parra testified that he developed agencies, recruited and appointed agents, and "beg[a]n to develop the whole structure." Parra testified that when he started working as a master general agent, he began with a total of 30 agents in 1986. By 1987, Parra testified that his agents produced approximately one million dollars in new premiums, and that in 1992, his agents generated between five and six million dollars in new premiums. Parra testified that ALICO recognized his accomplishments in publications and letters generated by the insurance company and he was awarded plaques and prizes.

Parra testified that ALICO appointed him supervising master general agent in 1991, which allowed him to appoint master general agents. Parra testified that with this promotion, ALICO increased his productivity bonus from 12% to 16%, which

was a minor change, and that ALICO added a persistency bonus.

Parra testified that he paid most of the first-year commissions and productivity bonus that he earned to his agents and master agents. Parra testified that after he became a supervising master general agent, approximately 90% of his personal compensation came from the persistency bonus ALICO paid him. Parra testified that ALICO based the persistency bonus on policies maintained by policy holders after the first year. Parra testified that his agencies' persistency rate was approximately 95% to 97%. Parra testified that 80% is considered a good persistency rate in the industry.

Parra testified that he promoted the following general agents to the position of master general agent when he became a supervising master general agent: Maria Noel Ache, Juan Carlos Garcia, Federico Grupe, Saul Krivopisk, Eduardo Parra, Jorge Patalagoity and Sancho Pagano. Parra testified that by the end of 1992, he had approximately 250 agents working under him. According to Parra, his most important master general agents were Ache, Garcia, Grupe, Krivopisk, Eduardo Parra and Patalagoity.

Parra testified that in July 1992, he and approximately thirty-five agents went on a cruise sponsored by ALICO for its top agents. During the cruise, Alex Fernandez, the president of the Latin American Life Insurance Division of ALICO, announced that by the end of the year, ALICO would open a new company in Argentina called ALICO Argentina, and that ALICO planned to terminate the IDB business when the new company began. Parra testified that Fernandez's announcement shocked and scared his agents and undermined his authority because he had not known about the announcement beforehand. Describing the loss of morale after Fernandez's announcement, Parra testified:

> my people began to talk to me about, immediately after leaving the ship, to go

to look for other companies, to other carriers. And this was logical. What could I tell them? [P]eople ... I ha[d] been working with for so many years and [whom] it took me so much money, time, and effort[ ] to recruit, train support, were looking for other companies, and I could not tell them no, because there was a high executive of the company telling them by the end of the year you will not have a product to sell. How could I tell them, ... don't look for another company?

These people had offices, employees, they had families, and I repeat here, in 20 ... minutes, it was all destroyed. An executive of the company telling them, you are out of work by the end of the year, that was tremendous.

Parra testified that following the July 1992 cruise, his agency network began to fall apart. According to Parra, agents began to look for other insurance companies. Parra testified that, unbeknownst to him, Fernandez met with Eduardo Parra, Garcia and Krivopisk, Parra's "best masters." According to Parra, this undermined his credibility with his agents and lowered morale. Parra testified that Garcia, Krivopisk and Eduardo Parra began selling insurance for other companies, while they continued to sell ALICO's IDB products. Parra testified that this reduced his productivity as a supervising master general agent.

Parra testified that in 1993, he received a letter from Azar terminating the SMGA Agreement. The letter states: "Recently we discussed your persistency bonus from ALICO. I explained that ALICO very much wanted to continue its business relationship with you. However, it needs to do so under a more mutually beneficial basis." Parra testified that he never discussed his persistency bonus with Azar or anyone at ALICO. Parra testified that the termination of his contract lowered morale. According to Parra:

I was completely shocked. I didn't know what to expect, really. I didn't know what was going to happen. Really, at that time, people would call me, ask me what happened. Everybody knew that they had terminated my contract.... For me it was so important because they were saying that they were going to ... change my only income, that was that persistency bonus. So people would call me asking what happened ... let's say this ended my ... reputation with them, because I passed in the short time to be the best organization, quality ... according to their publications, to hav[ing] a terminated contract a very short time later.

Parra testified that in 1994, he formed several new companies to sell insurance, including AIVA and Parkway. Parra testified that he incurred expenses of $150,000–$200,000 starting the new companies and $45,000–$50,000 per month subsequently. Parra testified that he incurred these start-up expenses at the time when his persistency rate was dropping and then cut. According to Parra, "It killed me. On the one hand, I was having big expenses on trying to develop the remaining part of my organization, to sell ALICO Argentina, and on the other hand, my income was being reduced, so it was really killing me."

Parra testified that before September or October 1994, it was common practice for ALICO to advance him funds against his future commissions and bonus payments. According to Parra, the advances were later deducted from his commissions and bonus payments.

Parra testified that in 1993, he worked briefly selling insurance for a company called Pan American, and earned approximately $30,000. Parra testified that in 1994 he started a company in Uruguay called Blue Cross/Blue Shield of Uruguay to sell Blue Cross/Blue Shield insurance products. Parra testified that he and his partners sold part of the company in 1994 for $250,000, which was reinvested in the company. Parra testified that these earn-

ings did not alleviate his troubled financial condition.

Parra testified that in 1994, Fernandez set up a meeting to discuss releasing the four master general agents from Parra's IDB operation. Parra testified that Fernandez offered to pay one year of income from IDB sales for each agent's release. Parra testified that he understood the phrase one year of income to mean any income generated by the agents, including first-year commissions, productivity bonuses and persistency bonuses.

According to Parra, Fernandez told him that "IDB was going to end by the end of the year, and that it would be logical, then, to release [the four master general agents]." According to Parra, "[t]he things that I remember were basically ... how much he was willing to pay for those contracts that they would be the four masters, that it would only be the IDB operation...." Parra testified that he believed Fernandez's statement that ALICO planned to terminate IDB because of Fernandez's position in ALICO. Parra testified that Fernandez did not say anything about releasing legal claims he might have against ALICO.

Parra testified that when he met with Fernandez, his financial condition was "very, very bad." According to Parra, he had sent checks for approximately $60,000 to $70,000 to ALICO to cover policyholder premium payments. Parra testified that he had insufficient funds to cover the checks in his accounts, and ALICO had returned them. Parra testified that he had used the policyholder premium payments to cover business expenses he incurred while trying to establish a new insurance network.

Defendants' counsel showed Defendants' Exhibit 10 to Parra. The exhibit is a fax message sent on September 2, 1994 on the letterhead of ALICO Wilmington from Mary Hennelly, an ALICO employee, to Federico Grupe, Parra's partner in Parkway. The message reads: "Federico, Joanne Warren has authorized the advance disbursement of payment for the release of various MGA's under the ASI-AT, Parkway/SMGA network effective October 1, 1994." Parra testified that Joanne Warren is a vice president of ALICO. Parra testified that he never received the funds authorized by Warren. Parra testified that if he had received the advance payment, he would have covered the bounced premium checks that ALICO had returned.

Defendants' counsel also showed Defendants' Exhibit 12 to Parra. This exhibit is a three-page fax message from Hennelly to Grupe and Parra stating that the total compensation for the release of the four Master general agents is $127,293.30, and that "[o]nce we have the final figures for the months of August and September, an additional payment will be made." Parra testified that the $127,293.30 sum represents the productivity bonus generated by the agents during a ten-month period. Parra testified that he never received payment based upon August and September figures.

Defendants' counsel also showed Parra Defendants' Exhibit 56, which is a September 19, 1994 fax sent by Hennelly to Grupe which reads: "Regarding the September 15th fax, regarding the release of the four MGA's, hopefully all paperwork will be competed within the next few days, the amount of the release is approximately $127,000." Parra testified that he never received the advance from ALICO referred to in Hennelly's faxes.

Defendants' counsel showed Defendants' Exhibit 14 to Parra. This is a fax dated October 3, 1994 from Hennelly to Grupe, which reads: "Federico, on another subject, we still have not received the wire transfer for the check[s] which were returned due to insufficient funds. Please advise status." The fax then reads "During Carlos' visit to Wilmington this week, we will ask him to sign a release form. Once we receive the signed release form, funds will be wired him." Parra testified

that this "was not the way that business was conducted at all during all these years" and that he found ALICO's refusal to advance him the funds for releasing the master general agents before he signed a release agreement "strange" and "surprising." Parra testified that "this [put] a lot of pressure on [him] and the threat of not having that advance and having the debt, having to cover that, the pressure was tremendous." Parra testified that he would not have felt this pressure if ALICO had advanced him the funds for releasing the master general agents at the beginning of September, 1994, which, Parra testified, would have been consistent with prior business practices.

Parra testified that on October 3, 1994, he traveled to ALICO's office in Wilmington to sign an agreement releasing the four master general agents. Parra testified that the entire transaction took approximately fifteen minutes. Parra testified that he first met with Warren, who presented him with the General Release for the first time. Parra testified that he and Warren discussed the subject of repaying the bounced premium checks.

Parra testified that he next went to see Hennelly because he could not understand the document. Parra testified "I could not understand it. I tried to understand, tried to read it and I didn't understand that at all. So I thought that Mary could help." Parra testified that Hennelly looked at the document "and she returned it immediately to me and said she didn't understand it either...." Parra testified that he asked Hennelly if he could take the document and get it translated before he signed it. Parra testified that Hennelly told him that he could, but that she was not authorized to advance Parra the funds, and so could not release the funds until Parra had signed the document. According to Parra, he was not able to cover the bounced premium checks until he signed the General Release.

Parra testified that he then signed the General Release in order to obtain the funds necessary to cover the bounced premium checks. At trial, Parra testified as follows:

Q. Why did you sign [the General Release]?

A. Because there was a threat of not giving me that advance, having that debt.... That was ... a lot of pressure on me. A lot of pressure. And so unusual, I mean for the first time they tell me I cannot give you the money. I'm not authorized.

Q. Had that ever happened before?

A. No, never. Never. Never. Never.

Q. Couldn't you have taken the document out of the office, and had a lawyer review it?

A. Yes, I could have. I needed the money. They knew that. I needed the money. I had to cover [the bounced checks]. I felt ashamed. I felt bad about that. I needed the money. The pressure was too ... much. I needed to cover that. I had been requesting this for some time already.

Parra testified that previously, when he asked for an advance, ALICO had given it to him. Parra testified that, at this time, ALICO was due to pay him commissions "for a lot more than that money [the bounced checks]" in the next ten days. Parra testified that he did not understand the terms of the General Release and that he felt he did not have any choice other than to sign it right then and there, because he needed the funds to cover the bounced premium checks. Parra testified that furthermore, he had relied on Fernandez's assertion that ALICO was terminating the IDB business when he signed the General Release.

Parra testified that he has no legal training, and that he did not understand his previous contracts with ALICO, but that he trusted ALICO. Parra testified that he relied upon ALICO to compute his commissions and bonuses, and that he nev-

er checked the amounts. Parra testified that ALICO paid him the $127,000 specified in the agreement, less the amount of the unpaid premiums Parra owed ALICO.

Parra testified that in 1992, ALICO paid him approximately $1.1 million dollars, representing commissions and bonuses. Parra testified that he paid the portion representing his productivity bonus and renewal commissions to the master agents working under him. Parra testified that in 1993, ALICO paid him approximately $1.5 million dollars, and that in 1994, ALICO paid him approximately $1.3 million. Parra testified that he paid part of the money he received from ALICO to his master general agents, and that another part he invested into building a new agency. Parra testified that in 1994, he invested more than $600,000 in developing new business.

Parra testified that his revenues from ALICO decreased 50% in 1995, and that the remaining revenue was made up almost entirely of his persistency bonus because his agents who brought in new business had left since Fernandez announced that ALICO was terminating its IDB operations. Parra testified that in 1996, ALICO paid him approximately $550,000. Parra testified that his persistency bonus had decreased because customers were not renewing their IDB policies, but were purchasing insurance policies from different companies. Parra testified that in 1997, ALICO paid him approximately $270,000. Parra attributed the decline in the revenue he received from ALICO to a decrease in persistency rate because agents were not selling ALICO policies to new customers, and also, agents were selling new policies from other companies to current policy holders.

On cross-examination, plaintiff's counsel questioned Parra about an advance of $34,675 ALICO paid Parra on September 7, 1994. Parra admitted that he received this advance before he signed the General Release.

Plaintiff's counsel questioned Parra about the circumstances surrounding the signing of the General Release. Parra admitted that no one denied him the opportunity to confer with a lawyer regarding the agreement's substance, or to further review the agreement. Parra testified that Hennelly told him she was not authorized to deposit the money Parra was to receive under the General Release until he signed it, and that he needed the money immediately. According to Parra, "if I had taken that document away, it would have taken forever to get the money. I needed the money. I had the threat of [not] getting the money. I needed that money and ALICO knew it." Parra also testified that ALICO was due to pay him commissions that would exceed the amount of the bounced premium checks in fifteen days. Parra admitted that Hennelly did not tell him he would not get the money owed him if he signed the agreement at a later date. In this regard, Parra stated:

I knew I could take the document with me. I knew I could revise it. I knew I would have to find a lawyer. It would take some time and I knew that if I came back with that document changed, with any change or if something happened, that [it would] take forever. I needed the money.... I was put in a situation where I felt a threat, a big threat. I needed the money.

On cross-examination, Parra testified that he deposited policy holder premium payments in his bank accounts, and that he spent the money on business expenses, which caused the checks he wrote to cover the premium payments to bounce. Parra testified that ALICO did not threatened legal action against him with regard to the bounced checks at the time he signed the General Release.

On cross-examination, Parra testified that ALICO terminated his persistency bonus on policies issued after November 1, 1993, but that ALICO continued to pay him a persistency bonus for policies writ-

ten by his agents before this date. Parra testified that ALICO had separate contracts with Parra's master general agents and paid them separately, and that ALICO did not require Parra to pay the master general agents out of his own productivity bonus.

On cross-examination, Parra asserted that when he signed the General Release, he thought he was only releasing the four named master general agents, and not the network of agents controlled by the master general agents. Parra testified that his counsel incorrectly stated in the arbitration proceedings that Parra was aware that the General Release released both the master general agents and the agents controlled by them.

Parra testified that in 1993 and 1994, he made several master general agents partners in Parkway, including Patalagoity, Grupe and Ache. None of the four master general agents covered by the General Release became partners in Parkway. Parra testified that he offered partnership to Eduardo Parra and Garcia, but they did not accept. Parra testified that he did not offer partnership to Krivopisk or Pagano. Parra also testified that he had difficult relationships with his brother, Eduardo Parra, and his brother-in-law, Garcia. Parra testified that Patalagoity and Grupe both left the partnership, and that he now has only one partner, Ache, whom he testified is his wife.

On redirect examination, Parra testified that the $34,000 advance he received was less than the amount he owed ALICO to cover the returned premium checks, and so it did not alleviate the pressure he felt. Parra also testified that he felt economic duress in 1994, even though he received $1.3 million from ALICO in revenue, because part of this money went directly to the master general agents and agents, and "the other part of it was persistency which I was reinvesting ... in the local business in the local company." Also, Parra testified that he had to pay business and personal expenses with this revenue. Parra

testified that he developed business with another insurer, Pan Am, because he understood that ALICO planned to terminate its IDB business in the near future. Parra also testified that as a general practice, he did not review his counsel's submissions in the arbitration proceeding, and that he was not aware of the statements made by his counsel regarding releasing the general agents.

Defendants next called Lee Adler, a former ALICO employee, and a current employee of American Security Life, a subsidiary of AIG. ALICO is also a subsidiary of AIG. Adler testified that, he headed ALICO's Life Profits Center in 1994 and 1995.

Adler testified that Parra's agency network was the largest network selling ALICO's IDB policies. Adler testified that in 1994, ALICO's offshore business in Argentina was diminishing, and that a factor contributing to the decrease was the agents' uncertainty about ALICO's future commitment to IDB. Adler testified that this uncertainty was caused by confusion on the part of the distributors.

Adler testified that he wrote a memorandum on April 20, 1994 to Azar, ALICO's president, and R.K. Nottingham, ALICO's chairman. In this memorandum, Adler discussed continuing the IDB business in Argentina through a Swiss subsidiary called Ticino. Adler testified that his memorandum reflects that by April 1994, Azar and Nottingham told Fernandez about plans to sell IDB in Argentina through Ticino. Adler testified that Fernandez wrote a memorandum in May 1994, and this memorandum indicated he did not want Azar to share this information with Parra's agents. Adler testified that around this same time, Parra reported to him that Fernandez told Parra's agents that ALICO's offshore business would end in a few months. Adler testified that in September 1994 he was concerned that offshore business had diminished to the extent that it could not be salvaged. Adler

also testified that he knew Parra had financial difficulties at this time.

On cross-examination, Adler testified that he had dinner with Parra in August or September 1994, during which they discussed the possibility of ALICO continuing to sell IDB policies in Argentina through Ticino. Adler testified that during dinner, Parra expressed concerns about the future of IDB, and Adler reassured him that IDB would continue. Adler stated that his "view of offshore business was that it was not going to go away, that the company was committed to this business. That in fact the company might shift the focus of the market or the products being sold or in fact move the business to a European subsidiary, but it was [his] belief and understanding that the business was not going to go away."

On redirect examination, Adler testified that during a deposition taken prior to his testimony, Adler did not remember having any specific conversation with Parra about Ticino, although he did state that he "would have discussed it [Ticino] with Carlos."

Defendants next called Mary Hennelly, ALICO's manager of quality assurance. Hennelly testified that in 1987 to 1996, she was ALICO's manager of policy owner service for the IDB business. Hennelly testified that her job entailed processing new applications submitted to the company, servicing policies, paying agents' commissions and interacting with the claims department. Hennelly testified that from 1987 to 1995, she reported to Joanne Warren.

Hennelly testified that she knew Parra and Fernandez did not get along, and that she had discussed this with Warren. Hennelly testified that Grupe told her that on the 1992 cruise, Fernandez told agents in Argentina that ALICO planned to terminate the IDB business, and that they would have to work for ALICO Argentina if they wanted to continue their relationship with ALICO. Hennelly testified that she spoke to Warren about Fernandez's assertions.

Hennelly testified that ALICO recruited agents selling IDB to work for ALICO Argentina, including agents in Parra's network. Hennelly testified that an ALICO marketing employee visited Krivopisk. Hennelly testified that ALICO terminated Parra's SMGA Agreement in order to eradicate Parra's persistency bonus.

Hennelly testified that Grupe sent her a fax requesting advance disbursement of payment for the release of the managing general agents listed in the General Release. According to Hennelly, partial payments were often disbursed to IDB agents in advance. Hennelly testified that ALICO disbursed approximately $34,000 to Parra in September 1994 in advance of his signing the General Release. Hennelly testified that she was mistaken in a prior deposition, when she said that no advance disbursement was made on the General Release. Hennelly testified that Warren instructed her not to pay Parra the balance owed under the General Release until he signed the agreement. Hennelly testified that she did not recall any other occasions when she was specifically instructed not to disburse funds in advance.

Hennelly testified that the $127,000 specified in the General Release only reflects ten months of the released managing general agents' incomes, and does not reflect the agents' persistency bonuses. Hennelly testified that she did not know if anyone compiled the final figures for August and September, as the agreement stated would be done. Hennelly testified that she faxed Parra a different version of the release agreement on September 15 than the one Warren presented him with on October 3, and that she did not give Parra a Spanish translation of the agreement. Hennelly testified that at the time ALICO drafted the General Release, she knew Parra needed money to cover the premium checks ALICO returned for insufficient funds. Hennelly testified that Fernandez was involved with the decision

to obtain the release from Parra, and that Warren worked with Fernandez to obtain the release.

On cross-examination, Hennelly testified that Parra never expressed dissatisfaction with the amount of compensation set out in the General Release. Hennelly testified that Parra never indicated that he thought he was releasing only the four named master general agents, and not the network of agents they supervised. Hennelly also testified that Parra never requested a Spanish translation of the General Release.

On redirect examination, Hennelly testified that after Parra signed the General Release, ALICO paid him approximately $83,000, and that this sum represented the $127,272 owed to him under the agreement less $43,666, the amount Parra owed ALICO to cover the returned premium checks. Hennelly testified that the amount paid to Parra did not reflect the deduction of a $34,000 advance disbursement.

Defendants next called Alex Fernandez who testified by telephone, pursuant to an agreement by the parties. Fernandez testified that he has been ALICO's Regional President for Latin America from 1992 to the present, and that part of his job is to oversee ALICO Argentina's operations. According to Fernandez, Parra was the only supervising master general agent in Argentina for IDB business.

Fernandez testified that he was responsible for building ALICO Argentina. Fernandez testified that in building ALICO Argentina's local or admitted business, he intended to convert agents in Parra's network who were selling IDB for ALICO to sell for ALICO Argentina.

Fernandez testified that in 1994, he knew that ALICO's senior executives were considering continuing IDB business in Argentina through Ticino, a Swiss subsidiary of ALICO's parent, AIG. Fernandez testified that he believed that ALICO could not have two operations in Argentina, one selling local products, like the products sold by ALICO Argentina, and the other selling offshore products like IDB. Fernandez testified that during a prior deposition he testified as follows:

Q. Did you ever learn that persons within the AIG or ALICO organization were considering a continuation of the IDB business through a Swiss AIG company so that when ALICO was asked whether or not it was operating an IDB business in Argentina, it could say no on the grounds that AIG rather than ALICO was operating the business?

A. Yes.

Fernandez testified that his deposition testimony was partially mistaken, because he did not know that ALICO and AIG executives considered selling IDB through Ticino to skirt the requirement that ALICO not sell both local and offshore products in Argentina.

Fernandez testified that on a cruise in 1992, he told agents in Parra's IDB network that ALICO was phasing out IDB, that ALICO was forming a new local company in Argentina, and that ALICO wanted IDB agents to transfer their "activity" to this company. Fernandez testified that by activity, he meant the agents' production for new life insurance business. Fernandez testified that he told the agents that ALICO would form the new company by the end of the year. Fernandez testified that he did not tell the agents that ALICO might continue to market IDB in Argentina through Ticino.

Fernandez testified that he met with agents in Parra's network, including master general agents and the general agents and agents working under them "just after the cruise." Fernandez testified that he met with Krivopisk and the general agents and agents under Krivopisk, and that Parra was not present at this meeting. Defendants' counsel showed Fernandez Exhibit 9, which is a business plan setting forth ALICO Argentina's top corporate objectives for 1994. Fernandez testified that

he oversaw the production of this business plan. Fernandez testified that the document states that establishing an independent sales force strongly identified with ALICO was very important for the success of ALICO Argentina. Fernandez testified that he planned to do this in 1994 by converting the agents selling for ALICO IDB and La Meridional. Fernandez testified that the document set forth the plan to build ALICO Argentina's sales force to 180 producers by the end of 1994. Fernandez testified that he planned to convert agents in Parra's network to sell for ALICO Argentina.

Fernandez testified that ALICO Argentina did not have any supervising master general agents, but only master general agents. Fernandez testified that ALICO Argentina could not fund a supervising master general agent position, because the product did not have the type of pricing that would support such a position. Fernandez testified that ALICO Argentina could not afford to pay the persistency bonus and other compensation that a supervising master general agent would require.

Fernandez testified that he met with Parra, and they agreed that Parra would release four master general agents, Garcia, Krivopisk, Pagano and Eduardo Parra, in return for an amount equal to the commission income Parra earned from them in the last twelve months. Fernandez testified that commission income is a standard formula used in business. Fernandez testified that Parra's persistency bonus was not a part of his commission income. Fernandez testified that he made a mistake during a previous deposition when he said that Fernandez agreed to pay Parra based upon "all income earned" by Parra from the released master general agents, including the persistency bonus.

Fernandez testified that he met with Nottingham and Azar in April 1994, and that they told Fernandez that ALICO would continue to accept IDB business from the current distribution sources in Argentina who chose not to affiliate with ALICO Argentina. Fernandez testified that he always took the position that ALICO could not continue to sell both local and offshore products at the same time. Fernandez testified that when he met with Parra to discuss releasing Parra's master general agents, Parra knew that Fernandez took the position that IDB business would end in two or three months. Fernandez testified that he never discussed with Parra that Nottingham had said that ALICO would continue issuing IDB business in Argentina.

On cross-examination, Fernandez testified that when he and Parra met to discuss releasing the four master general agents, Fernandez did not threaten Parra. Fernandez testified that he did not tell Parra that the deal was limited to the individual heads of the master general agent networks, and did not tell Parra that the compensation formula would include the persistency bonus. Fernandez testified that Parra never told him, either before or after he signed the agreement, that ALICO had used the wrong compensation formula.

Fernandez testified that Parra and the master general agents covered by the agreement had "constant[ly] bicker[ed]." Fernandez testified that he received "constant calls" from these master general agents "to let me know they were having problems with ... Parra, that ... Parra was stealing their agents, that ... Parra was not delivering their policies, was not paying them what was due to them, was not providing the services that they had agreed."

Defendants next called R. Kendall Nottingham, ALICO's chairman and chief executive officer. Nottingham testified that he wanted to use Parra's network to sell ALICO Argentina's products. Nottingham testified that he thought it would not be feasible to provide ALICO IDB business and operate ALICO Argentina at the same time. Nottingham testified that he

thought it would be possible to continue to distribute IDB policies in Argentina through Ticino. Nottingham testified that he was aware Parra and Fernandez did not have a "good relationship" sometime before this litigation commenced.

### C. The Plaintiff's Case In Chief

As its first witness, ALICO called Federico Grupe, a master general agent for ALICO Argentina. Grupe testified that in 1988, he became a general agent in Parra's network, and in 1992, he became a master general agent. Grupe testified that Parkway was formed in 1993 and had four partners, Ache, Grupe, Parra and Patalagoity. Grupe was also Parkway's president. Grupe testified that Parkway sold offshore life insurance products for ALICO and Pan American Life. According to Grupe, ALICO and Pan American Life sold competing off-shore insurance products. Grupe testified that Pan American Life had a wider variety of products, and offered a higher commission schedule for agents. Grupe testified that from the beginning, Parkway encouraged its agents to sell Pan American's life insurance products over ALICO's life insurance products. Grupe testified that Parra made decisions for Parkway, and was involved in the decision to push Pan American products.

Grupe testified that from 1993 through 1995, he and Parra formed several other companies, including AIVA and Blue Cross Blue Shield of Uruguay. Grupe testified that Ache, Grupe, Parra and Patalagoity were partners in AIVA. According to Grupe, AIVA was started in 1994 to sell local insurance products. Grupe testified that AIVA sold insurance products for ALICO Argentina and another local company called Manateale.

Grupe testified that from 1993 through 1994, Parkway and AIVA together incurred expenses of approximately $25,000 per month and that AIVA incurred an initial capital expense of approximately $100,000. Grupe testified that during this time period, Blue Cross Blue Shield of Uruguay incurred expenses of approximately $25,000 per month, and an initial capital expense of approximately $100,000. Grupe testified that these expenses were paid from commissions and also by Parra. Grupe testified that the businesses were not generating sufficient revenue to cover expenses.

Grupe testified that in the months leading to the General Release, Parra did not get along with Garcia, Krivopisk or Eduardo Parra, and that Parra and Krivopisk were not on speaking terms at this point. Grupe testified that around the time Parkway was established, Garcia and Eduardo Parra told Grupe they wanted to separate from Parra's network. Grupe testified that Parra told Grupe that he was negotiating with Fernandez to release Garcia, Krivopisk, Pagano and Eduardo Parra in exchange for an amount equal to one year of first-year commissions. Grupe testified that Parra told Grupe that this was a good idea because Krivopisk's company, Nugrant, was bringing in less business than it used to, and the agents seeking release were looking to develop offshore business with another company.

Grupe testified that on August 9, 1994, ALICO disbursed $50,000 to Parra in advance of a production bonus, and on September 7, 1994, ALICO disbursed $34,675 to Parra in advance of the amount to be paid for the General Release.

Grupe testified that Parra never said that he was threatened, and never said he thought the final calculation for the release, $127,292.30, was incorrect nor failed to correspond to the deal reached with Fernandez. Grupe testified that Parra never said he signed the release because Fernandez told him ALICO planned to terminate IDB in two months. Grupe testified that in September 1994, he received a memorandum from Azar which read as follows:

Whereas, over the past year, our messages to you may have appeared mixed or confusing, our intentions have always

been to cultivate the IDB business, preserving our sound relationship with you, which has grown throughout the years.... ALICO's senior management feels that the IDB business and its network of MGA's [master general agents] are valuable to our long-term business strategy. We have every intention of supporting and committing resources to the IDB business.

Grupe testified that when he received the memorandum, he did not believe ALICO planned to terminate the IDB business in one or two months. Grupe testified that at this time, he understood that ALICO planned to transfer its IDB business to one of its affiliate companies.

On cross-examination, Grupe testified that he presently sells ALICO Argentina insurance products exclusively. Grupe testified that Parra assisted him in building a general agency under Parra's supervising master general agency, and that Parra arranged for his promotion to master general agent for ALICO. Grupe testified that Parra provided training, seminars, and conventions for Grupe's agents. Grupe testified that it did not appear that a $34,000 advance disbursement was deducted from the amount paid to Parra pursuant to the General Release.

ALICO next called Joanne Warren, who is a vice president of ALICO. Warren testified that in October 1994, she was responsible for the IDB Administrative Unit. Warren testified that she handed Parra the General Release when he came to ALICO's Wilmington office. Warren testified that Parra did not indicate any surprise, did not ask any questions and did not ask for payment in advance of signing the agreement.

Warren testified as to Parra and Krivopisk's relationship. Warren testified that Krivopisk told her that he resented the fact that Parra got commissions from the business Krivopisk generated for ALICO. Warren testified that Krivopisk told her he was a better businessperson than Parra, and that he was responsible for recruiting

his own agents, and that he provided his own agents with training.

Warren testified as to Parra's relationship with Eduardo Parra. Warren testified that Eduardo Parra told her that he was upset that Parra had not made him a partner in Parkway, and that he did not want to work with Parra any longer.

On cross-examination, Warren testified that she knew that Parra and Grupe had requested advance disbursement of the money to be paid pursuant to the General Release.

### D. *The Jury's Verdict*

After deliberating, the jury found for defendants on the affirmative defense of fraud. By their answers to questions on the verdict form, the jury found that ALICO made a misrepresentation to defendants and that the misrepresentation was fraudulent and material. The jury found that the misrepresentation was not innocent. Further, the jury found that the misrepresentation induced Parra to sign the release, and that Parra's reliance upon the misrepresentation was reasonable.

The jury also found for defendants on the affirmative defense of economic duress. On the verdict form, the jury reported that at the time Parra signed the General Release, ALICO threatened him. The jury found that the threat destroyed Parra's free will and caused him to sign the General Release. The jury found that Parra did not have a reasonable alternative to signing the General Release. The jury found that ALICO's threat violated a duty of good faith and fair dealing between the parties with respect to their contractual relations. The jury found that the General Release was unfair to Parra and that ALICO's threat was made more effective because of prior unfair dealing by ALICO.

### E. *Post–Trial Motions*

At the close of its own evidence and at the close of defendants' evidence, ALICO

moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). On January 27, 1999, ALICO renewed its motion for judgment as a matter of law and, in the alternative, ALICO moved for a new trial pursuant to Federal Rule of Civil Procedure 59. ALICO contends that: (1) defendants did not present sufficient evidence for the jury to find that the General Release was void for duress; and (2) defendants did not present sufficient evidence for the jury to find that the General Release was void for fraud.

## II. DISCUSSION

By its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or, in the alternative, for a new trial pursuant to Rule 59, ALICO seeks relief from an adverse jury verdict.

### A. Judgment as a Matter of Law

■ To prevail on its motion for judgment as a matter of law following the jury verdict, ALICO must show that there is "no legally sufficient evidentiary basis" for a reasonable jury to find for defendants. Fed.R.Civ.P. 50(a); see Gomez v. Allegheny Health Servs. Inc., 71 F.3d 1079, 1083 (3d Cir.1995) (describing standard as "whether there is evidence upon which a reasonable jury could properly have found its verdict"); 9A Wright & Miller, Federal Practice & Procedure § 2524, at 249–66 (3d ed. 1995) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury properly could find a verdict for that party.").

■ In performing this assessment, the court must view all the evidence in the light most favorable to the non-movant. Alexander v. University of Pittsburgh Med. Ctr. Sys., 185 F.3d 141, 145 (3d Cir. 1999); Rego v. ARC Water Treatment Co. of Pa., 181 F.3d 396, 400 (3d Cir.1999); Gomez, 71 F.3d at 1083. The court may not pass judgment on the credibility of witnesses, and it may not "substitute its

judgment of the facts for that of the jury." Wright & Miller, supra, § 2524, at 255–56. Rather, the court must determine "whether the record contains the minimum quantum of evidence from which a jury might reasonably afford relief." Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 691 (3d Cir.1993); Wright & Miller, supra, § 2524, at 256.

As follows, the court addresses ALICO's arguments that there is insufficient evidence to support the jury's verdict of (1) duress and (2) fraud.

### 1. Does the Evidence Support the Jury's Finding of Duress?

The jury found that the General Release entered into between ALICO and Parra was void because Parra executed the release under duress. Traditionally, under Delaware law, a release was void for duress "only when it was executed by physical force, threat of force, or by unlawful threats destroying the victim's free will." Egan & Sons Air Conditioning Co. v. General Motors Corp., 1988 WL 47314, at *5 (Del.Super.Ct. Apr. 27, 1988). "The general test which applies is whether or not any unlawful threats found to have occurred destroyed the victim's free will and compelled him to comply with a demand for the release." Vassallo v. Haber Elec. Co., 435 A.2d 1046, 1050 (Del.Super.Ct.1981).

The Restatement (Second) of Contracts, however, articulates a broader theory of duress. According to section 175 of the Restatement, "[i]f a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable for duress." Restatement (Second) of Contracts, § 175 (1982). An even more expansive notion of duress is found in section 176 which provides in part that a threat is improper if the threat is a breach of the duty of good faith and fair dealing under the contract. Restatement (Second) of Contracts, § 176 (1982).

Delaware law on the issue of duress is not settled. Some Delaware courts have adhered to the traditional theory of duress and required an unlawful threat that destroys a victim's free will. *See, e.g., Chelly v. Jackson,* 1977 WL 9519, at *3 (Del.Ch. Jun. 13, 1977). On the other hand, other Delaware courts have adopted section 175 of the Restatement and held that duress requires an improper threat that leaves the victim no reasonable alternative. *See, e.g., Kayne v. Klassman,* Civ.A. No. 11333, 1991 WL 94299, at *3 (Del.Ch. May 20, 1991). However, no Delaware court has adopted the expansive definition of improper threat set forth in section 176 of the Restatement.

In its earlier opinion in this case, the court stated that lawful but wrongful threats may be sufficient to constitute duress. *American Life Insur. Co. v. Parra,* 25 F.Supp.2d 467, 478 (D.Del.1998) (citing *Reiver,* 625 F.Supp. at 1013–14). Then at trial, the court quoted the Restatement's definition of improper threat when it instructed the jury as follows:

Jury Instruction, J–28, Duress

A person whose agreement to a contract was brought about by duress that denied the person's free will is not bound by that agreement. Duress may be induced by an improper threat that leaves the victim no reasonable alternative.

A threat is improper if that threat is a breach of duty of good faith and fair dealing under a contract with the recipient. A threat is also improper if the resulting agreement is not on fair terms and the effectiveness of the threat in inducing a party's assent is significantly increased by prior unfair dealing by the party making the threat.

. . . . .

■ After further review of Delaware law, the court concludes that it erred in its prior opinion and in the jury instructions. Although Delaware courts have recognized section 175 of the Restatement, they have not enlarged the concept of duress to include lawful but wrongful threats, or breaches of the duty of good faith and fair dealing. Rather, recent Delaware cases articulate a three prong test for duress, providing that a release may be void for duress where a party's manifestation of assent is induced by (1) an improper threat, (2) which overcomes the party's free will and (3) leaves the party with no reasonable alternative to protect his interest. *E.I. du Pont de Nemours and Co. v. Custom Blending Int'l, Inc.,* No. C.A. 16295–NC, 1998 WL 842289, at *4 (Del.Ch. Nov. 24, 1998); *see also Kayne v. Klassman,* Civ.A. No. 11333, 1991 WL 94299, at *3 (Del.Ch. May 20, 1991). Following this framework, the court addresses ALICO's actions with respect to each of these three elements of duress under Delaware law.

### a. Did ALICO improperly threaten Parra?

■ ALICO contends that defendants did not establish that ALICO threatened Parra. ALICO argues that the only "threat" that Parra testified to was the threat of not being given an advance on the consideration that ALICO agreed to pay for the release. ALICO argues that any pressure Parra might have felt to sign the General Release arose because Parra created financial pressure by using premiums paid by policy holders to fund his own business ventures. ALICO points to Parra's testimony that he needed the advance from ALICO to honor checks that Parra wrote to ALICO to repay the premiums.

Defendants counter that there was sufficient evidence for the jury to find that ALICO improperly threatened not to advance funds to Parra until he signed the General Release. Specifically, defendants argue that ALICO's failure to advance the funds was a violation of the duty of good faith and fair dealing because Parra testified that ALICO routinely made similar advances during his 15 years with the company. According to defendants, "[i]t is hard to conceive of a more potent threat

than taking an action ... that not only was a violation of the duty of good faith and fair dealing ... but that ALICO knew would inflict serious financial harm on Parra."

Under Delaware's theory of duress, the court finds that the evidence presented at trial does not support the jury's finding that ALICO improperly threatened Parra. In every contract there is an implied threat that one party will not perform unless his terms are accepted by the other party to the contract. This type of threat is not improper because it is a necessary part of the bargaining process. *Coca–Cola Bottling Co. of Shreveport, Inc. v. Coca–Cola Co.*, 769 F.Supp. 671, 738 (D.Del. 1991) ("While [defendant] may have driven a hard bargain when it refused to supply plaintiffs with diet Coke unless they signed the Temporary Amendment, mere hard bargaining is insufficient to constitute duress, even when one of the parties is in financial difficulty."). In this case, the testimony shows that in exchange for Parra signing the General Release, ALICO agreed to pay Parra approximately $127,-000. While Parra testified that "there was a threat of not giving me [an] advance," ALICO's refusal to advance some of the consideration for the release before Parra performed his end of the bargain and signed the release is not an improper threat.

Moreover, even if Delaware were to adopt the Restatement's more expansive view that a breach of the duty of good faith and fair dealing may constitute an improper threat, ALICO's refusal to advance the funds would not constitute an improper threat. ALICO had the right to refuse to compensate Parra for the General Release until after Parra signed the release. A party does not breach the duty of good faith and fair dealing under a contract by exercising its contractual rights, even if by exercising its rights, it injures the other party. *See Coca–Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.*, 769 F.Supp. 599, 652 (D.Del.1991), *rev'd in part on other grounds*, 988 F.2d 386 (3d Cir.1993); *see also Du Pont*, 1998 WL 842289, at *4 (holding that exercise of right to sue another party is not duress). Therefore, the court concludes that there was not sufficient evidence for a reasonable jury to have found that ALICO improperly threatened Parra.

### b. *Did ALICO destroy Parra's free will?*

 ALICO contends that defendants did not demonstrate that any alleged threat destroyed Parra's free will. ALICO argues that Parra signed the General Release because he was desperate to cover the bounced checks he wrote to repay the premium payments. As ALICO's counsel stated, "the only 'evidence' provided by ... Parra is an amalgam of inconsistent statements and outright lies. There is simply no evidence that ... Parra's free will was destroyed...."

Defendants counter that there was more than the "minimum quantum of evidence" necessary to sustain the jury's finding that ALICO destroyed Parra's free will. In particular, defendants point to Parra's testimony that because of his financial situation, he was forced to sign the General Release.

The court finds that ALICO did not destroy Parra's free will. Parra testified that he knew he could have delayed signing the release. "I knew I could take the document with me. I knew I could revise it. I knew I would have to find a lawyer." Parra's argument that he was forced to sign the release because of his financial situation is not sufficient to prove that ALICO destroyed his free will.

### c. *Did Parra have a reasonable alternative?*

 ALICO argues that Parra had a reasonable alternative to signing the General Release because Parra could have delayed signing the General Release without penalty. Also, ALICO contends that the fact that Parra initiated the arbitration

proceeding demonstrates that he had a reasonable alternative to signing the General Release.

Defendants counter that the jury acted reasonably in finding that Parra had no reasonable alternative to signing the General Release. According to defendants, the evidence shows that Parra needed the advance "to try to save his business and his reputation" and therefore, commencing an "expensive, lengthy arbitration" was not a reasonable alternative. Defendants argue that it would have been unreasonable for Parra to delay signing the release "under the extreme circumstances that ALICO had placed Parra."

The court finds that Parra had a reasonable alternative to executing the General Release. Instead of signing the release, Parra could have sought relief in arbitration. Parra's testimony that the arbitration proceeding was too long and expensive does not make the arbitration alternative unreasonable, especially since Parra eventually used the arbitration option to initiate proceedings against ALICO under the original agreement.

For the reasons set out above, the court will grant ALICO's motion for judgment as a matter of law on the issue of duress.

### 2. Does the Evidence Support the Jury's Finding of Fraud?

■ The jury found that the General Release entered into between ALICO and Parra was void because it was obtained through fraud. The elements of common law fraud are: (1) a false representation of a material fact; (2) the knowledge or belief that the representation was false, or made with reckless indifference to the truth; (3) an intent to induce another party to act or refrain from acting; (4) the party's action or inaction taken in justifiable reliance on the representation; and (5) damage to the other party as a result of the misrepresentation. *Tam v. Spitzer,* Civ.A. No. 12538, 1995 WL 510043, at *6 (Del.Ch. Aug. 17, 1995); *Messick v. Moore,* Civ.A. No. 1630, 1994 WL 643188, at *5 (Del.Ch. Oct. 26, 1994); *see also Weir v. Manerchia,* Civ.A. No. 14836, 1997 WL 74651, at *4 (Del.Ch. Jan. 28, 1997).

■ The Delaware Supreme Court has recognized that an innocent material misrepresentation in an executory contract for the sale of real estate may be grounds for rescission of the contract. *See Norton v. Poplos,* 443 A.2d 1, 4 n. 7 (Del.1982) (stating that rescission may be appropriate in cases involving executory contracts for the sale of real estate even absent proof of common law fraud). "This departure from the common law requirements reflects equity's willingness to provide, in appropriate circumstances, a remedy for negligent or innocent misrepresentations." *Tam,* 1995 WL 510043, at *6. The elements of equitable fraud are basically the same as common law fraud, except for scienter. *Id.* "That is, to obtain relief in equity, the defendant does not have to know or believe that her statement was false or misleading or to have proceeded in reckless disregard of the truth." *Id.*

In this case, the jury found that the General Release was void because it was obtained through common law fraud. The court instructed the jury on equitable fraud and the jury found that ALICO did not make any innocent misrepresentations to Parra. It is not necessary to address whether ALICO's conduct may have amounted to equitable fraud because the court finds that there is sufficient evidence to support the jury's verdict that the General Release was void because it was obtained through common law fraud.

### a. Did Fernandez misrepresent a material fact?

■ The first issue is whether ALICO, through Fernandez, made a false representation of material fact to Parra concerning the General Release. A misrepresentation is merely "an assertion that is not in accordance with the facts." *Norton,* 443 A.2d 1, 5 (quoting Restatement (Second) of Contracts § 159 (1982)); *Pennsylvania Truck Line, Inc. v. Hen-*

*dricks,* 1986 WL 3969, at *2 (Del.Super.Ct. Mar. 26, 1986). "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." *Alabi v. DHL Airways, Inc.,* 583 A.2d 1358, 1362 (Del.Super.Ct.1990) (quoting Restatement (Second) of Contracts § 162 (1979)); *Messick,* 1994 WL 643188, at *5.

■ In Delaware, a statement of opinion, when clearly expressed as such, cannot be a misrepresentation. *Consolidated Fisheries Co. v. Consolidated Solubles Co.,* 112 A.2d 30, 37 (Del.1955). Even an opinion, however, may "rise to the level of a misstatement of fact when made by one with special or superior knowledge." *Tam,* 1995 WL 510043, at *8. Furthermore, statements of opinion when expressed as accomplished fact can become the basis for an action for fraud. *Eastern States Petroleum Co. v. Universal Oil Products Co.,* 3 A.2d 768, 775 (Del.Ch. 1939).

Defendants contend that ALICO, through Fernandez, made four material misrepresentations: (1) that ALICO was terminating the IDB business; (2) that the General Release was limited to the IDB business and did not relate to the business of ALICO Argentina; (3) that the General Release was limited to four master general agents and did not include the network of agents they supervised; and (4) that Parra's payment for the General Release was based on his previous twelve months of compensation and included his persistency bonus.

ALICO denies that Fernandez made any misrepresentations. First, ALICO contends that Fernandez's statement that AL-ICO was terminating the IDB business was opinion and as such it cannot be the basis for a misrepresentation. Even if the statement is not an opinion, ALICO argues that it is not material because Parra also believed that ALICO was terminating the IDB business. Second, ALICO claims that defendants did not present any evidence that the General Release was limited to the IDB business. Third, ALICO argues that Fernandez did not tell Parra that the General Release was limited to the four master general agents. Fourth, ALICO contends that Fernandez did not misrepresent Parra's compensation for the General Release because Parra agreed to accept $127,292.50.

■ Whether or not Fernandez made a material misrepresentation to Parra concerning the General Release is largely a question of which witness is to be believed. Parra testified that Fernandez made four misrepresentations. Fernandez testified that he did not. Although the jury found that ALICO, through Fernandez, made a material misrepresentation, the jury did not specify how many of Fernandez's statements were material misrepresentations.

The court finds that there was sufficient evidence for a jury to reasonably conclude that at least one of Fernandez's statements to Parra—that ALICO was terminating the IDB business—was a material misrepresentation. It is undisputed that Fernandez told Parra that ALICO was terminating the IDB business at the end of 1994. Contrary to Fernandez's statement, ALICO continued the IDB business until 1997. Furthermore, it is reasonable to conclude that Parra would rely on Fernandez's misrepresentation in evaluating whether to release his master general agents. Even if, as ALICO argues, Fernandez's statement was mere opinion, the jury could reasonably conclude that as a high-level ALICO official, Fernandez had special or superior knowledge about the future of the IDB business. Therefore, there is sufficient evidence to conclude that Fernandez misrepresented a material fact.

b. *Did Fernandez know or believe his representation was false or make the representation with reckless disregard for the truth?*

The second issue is whether Fernandez knew or believed his representation that

ALICO was terminating the IDB business was false or whether he recklessly disregarded the truth. This scienter requirement is what separates common law fraud from equitable fraud. Defendants contend that Fernandez knew that ALICO was not going to terminate the IDB business when he told Parra otherwise. On the other hand, ALICO argues that Fernandez did not know for sure what the company was going to do with the IDB business. ALICO claims that Fernandez's statement to Parra was merely an opinion about ALICO's future plans for the IDB business.

Parra testified that Fernandez told him that "IDB was going to end by the end of [1994], and that it would be logical, then, to release [the four master general agents]." It is undisputed that Fernandez knew that ALICO might continue the IDB business when he told Parra otherwise. Fernandez testified that the chairman of ALICO told him that the company might maintain its IDB business through a Swiss subsidiary. Fernandez's statements to Parra created the opposite impression. From this evidence, the jury could reasonably conclude that when Fernandez told Para that ALICO was terminating the IDB business, Fernandez knew or believed that his assertion was not in accord with the facts.

### c. Did Fernandez intend to induce Parra to sign the General Release?

The third issue is whether Fernandez intended to induce Parra to sign the General Release when he misrepresented that ALICO was terminating the IDB business. "A misrepresentation induces a party's manifestation to assent if it substantially contributes to his decision to manifest his assent." *Alabi*, 583 A.2d 1358, 1363 (quoting Restatement (Second) of Contracts § 167 (1982)). "It is not necessary that the party's reliance on the misrepresentation be 'the sole or even the predominant factor in influencing his conduct.'" *Id.* (quoting Restatement (Second) of Contracts § 167, cmt. a).

ALICO argues that Fernandez's misrepresentation that ALICO was terminating the IDB business did not induce Parra to sign the General Release because Parra testified that he held the same opinion about the future of the IDB business. ALICO points to Parra's testimony that it was "logical" that ALICO would end the IDB business when it started selling policies through ALICO Argentina.

Defendants counter that Fernandez's misrepresentation about the future of the IDB business induced Parra to sign the General Release. Defendants focus on Parra's testimony that Fernandez's misrepresentation was the "key factor" and "reason why" Parra signed the General Release. According to defendants, the evidence establishes that Fernandez's misrepresentations "substantially contributed" to Parra's decision to sign the release.

The court finds that there was sufficient evidence for a jury to reasonably conclude that Fernandez intended to induce Parra to sign the General Release when he misrepresented that ALICO was terminating the IDB business. Parra testified that Fernandez's misrepresentation substantially contributed to his decision to release the master general agents. Fernandez denied that he intended to induce Parra to sign the General Release. Again, whether or not Fernandez had the requisite intent is largely a question of witness credibility. The testimony provides a reasonable basis for the jury to conclude that Fernandez's misrepresentation substantially contributed to Parra's decision or may even have been the predominant factor influencing him to sign the release.

### d. Was Parra's reliance on Fernandez's misrepresentation justifiable?

The fourth element to be considered is whether Parra's reliance on ALICO's fraudulent misrepresentations was justifiable. "A misrepresentation will have no legal effect unless the recipient's reliance is justified." *Alabi*, 583 A.2d at 1363.

ALICO argues that Parra's reliance was unreasonable for several reasons. First, ALICO points to Parra's testimony that he did not trust Fernandez because Fernandez had already "destroyed him" at the time the General Release was signed. Next, ALICO argues that reliance was not justifiable in light of the conflicting statements Parra received from ALICO officials about the future of the IDB business. Moreover, Parra admitted that he received a letter from Azar stating that ALICO planned to continue IDB. Therefore, ALICO argues that Parra's reliance was not justifiable.

Defendants counter that the evidence establishes that Parra justifiably relied upon ALICO's misrepresentations. According to defendants, even though Parra did not trust Fernandez, it was reasonable for Parra to rely on Fernandez's statements because Fernandez was a high-level ALICO official. Defendants argue that testimony by Parra and Fernandez supports this conclusion. For example, Fernandez testified:

Q. And you also told [the IDB agents] that IDB would be phased out when the local company was formed, right?

A. That's correct.

Q. And you told them that was all going to happen by the end of the year, didn't you?

A. I told them that I had estimated that the new company would be formed by the end of the year.

Q. And wouldn't you have expected these agents to believe that you knew what you were talking about since you were a senior executive of the company?

A. Yes.

Q. And you expected them to believe you, didn't you?

A. That's correct.

Even though Adler testified that he told Parra that ALICO considered continuing the IDB business, defendants contend that Adler was discredited during impeachment. Defendants argue that the jury could have discarded Adler's testimony for lack of credibility and that any conflicting evidence must be construed in their favor.

There was sufficient evidence at trial for a jury to conclude that Parra's reliance on Fernandez's misrepresentations was justifiable. Fernandez was the "high-level ALICO official" responsible for the IDB business and ALICO Argentina. Moreover, Fernandez was the ALICO official who negotiated the General Release with Parra. Therefore, based on the testimony presented at trial, the court finds that a jury could reasonably conclude that Parra's reliance was justifiable.

### e. *Was Parra damaged from the misrepresentation?*

The final element to be considered is whether Parra suffered damages from his reliance on Fernandez's misrepresentation. Parra was induced to release his master general agents because Fernandez said that ALICO was terminating the IDB business. After Parra released the agents, ALICO continued the IDB business. It is undisputed that Parra did not receive the same amount of persistency bonus from ALICO after he signed the General Release. Thus, the jury could have reasonably found that Parra was damaged from his reliance on the misrepresentation.

For the reasons set out above, the court will deny ALICO's motion for judgment as a matter of law on the issue of fraud.

### B. *New Trial*

Federal Rule of Civil Procedure 59(a) permits the court to order a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a). Although Rule 59(a) does not specify the grounds on which a court can grant a new trial, "[t]he court has the power and duty to order a new trial whenever, in its judgment, this

action is required in order to prevent injustice." 11 Wright & Miller, *Federal Practice & Procedure* § 2805, at 55 (1995). "The decision to grant or deny a new trial is confided almost entirely to the discretion of the district court." *Blancha v. Raymark Industries,* 972 F.2d 507, 512 (3d Cir.1992) (citing *Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980)).

In deciding whether to grant a new trial, the district court may consider, among other things, whether the verdict is against the weight of the evidence or whether the court committed a prejudicial error of law. Wright & Miller, *supra,* at 54–55. The Third Circuit provides for different standards of review for new trial motions depending on whether the motion is based on a prejudicial error of law or a verdict against the weight of the evidence.

When the district court commits a prejudicial error of law, it has wide discretion in deciding a motion for a new trial. *See Klein v. Hollings,* 992 F.2d 1285, 1289–90 (3d Cir.1993); *Lee v. Consolidated Rail Corp.,* 1995 WL 734108, at *2 (E.D.Pa.1995). The district court has this discretion because rulings of law initially rest with the district court judge, so ordering a new trial because a ruling of law may have prejudiced the losing party does not usurp the jury's role as fact finder.

When the verdict is against the weight of the evidence, however, the district court's discretion to order a new trial is much narrower. The Third Circuit has cautioned that the district court should grant a new trial on this basis "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir. 1991). This more stringent standard is necessary to ensure that a district court does not substitute its 'judgment of the facts and the credibility of the witnesses

for that of the jury.' *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 211 (3d Cir.1992) (quoting *Lind v. Schenley Indus. Inc.,* 278 F.2d 79, 90 (3d Cir. 1960) (en banc)).

In considering a new trial motion, the district court must "view all the evidence and inferences reasonably drawn therefrom in the light most favorable to the party with the verdict." *Marino v. Ballestas,* 749 F.2d 162, 167 (3d Cir.1984). To uphold the verdict, the district court need only determine that the record contains the minimum quantum of evidence from which a jury might reasonably afford relief. *See Dawson v. Chrysler Corp.,* 630 F.2d 950, 959 (3d Cir.1980) (quoting *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir. 1969)). The district court does not grant a new trial motion based on harmless error. Fed.R.Civ.P. 61 (stating that court should disregard any "error or defect in the proceeding which does not affect the substantial rights of the parties").

As follows, the court addresses ALICO's motion for a new trial.

### 1. Should the Court Grant ALICO's Motion for New Trial Based on the Jury Instructions?

The court must review alleged errors in the jury instructions to "determine whether, if taken as a whole, the [instructions] properly apprised the jury of the issues and the applicable law." *Tigg Corp. v. Dow Corning Corp.,* 962 F.2d 1119, 1123 (3d Cir.1992); *Gutzan v. Altair Airlines, Inc.,* 766 F.2d 135, 138 (3d Cir. 1985) (stating that failure to instruct the jury as requested does not constitute error so long as the instruction properly apprised the jury of the issues and applicable law). The court examines the jury instructions as a whole, considering the totality of the instructions, and not individual sentences or paragraphs in isolation. *Limbach Co. v. Sheet Metal Workers Int'l Ass'n,* 949 F.2d 1241, 1259 n. 15 (3d Cir. 1991). Furthermore, "[n]o party may assign as error the giving or the failure to

give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51; *see also* Wright & Miller, *supra* § 2553, at 400.

### a. Should the court grant ALICO's motion for new trial based on the jury instruction for fraud?

▮▮▮ The first error that ALICO alleges in its motion for a new trial is that the jury instruction on fraud was improper. The court instructed the jury on fraud as follows:

Jury Instruction, J–23: Fraudulent Misrepresentation

A misrepresentation is fraudulent if:

1. the maker intends his assertion to induce a party to take certain action and the maker:

 a. knows or believes that the assertion is not in accordance with the facts, or

 b. does not have the confidence that he states or implies in the truth of the assertion, or

 c. knows that he does not have the basis that he states or implies for the assertion.

The court based this instruction on *Alabi v. DHL Airways, Inc.,* 583 A.2d 1358 (Del.Super.Ct.1990).

ALICO contends that this instruction does not represent Delaware law because the Delaware Supreme Court requires proof that the declarant knew or believed that the representation was false, or that he made the statement with "reckless indifference" to its truth or falsity. *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.,* 624 A.2d 1199, 1208 n. 17 (Del.1993); *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983). ALICO argues that the standard articulated in the court's jury instruction required a lesser state of mind than reckless indifference.

After reviewing the docket, the court finds that ALICO proposed the jury instruction on fraud that it now objects to as a basis for new trial. Because ALICO did not object to the instruction before the jury began deliberations, ALICO is barred from raising this objection after trial. Furthermore, even if ALICO had objected, the court finds that the jury instruction on fraud would not warrant a new trial. Accordingly, the court will deny ALICO's motion for new trial on this ground.

### b. Should the court grant ALICO's motion for new trial based on the jury instruction for materiality?

▮▮▮ The next error that ALICO alleges in its motion for a new trial is that the jury instruction on materiality was improper. The court instructed the jury that "[a] misrepresentation is material if it would be likely to induce a reasonable person to give his agreement, or if the maker knows that it would be likely to induce the recipient to do so." Jury Instruction, J–27, Materiality.

ALICO contends that this instruction does not represent Delaware law because it imposes a subjective standard that invites the jury to focus on the maker's knowledge. ALICO argues that the Delaware Supreme Court used an objective standard when it defined materiality in the securities context. *Rosenblatt v. Getty Oil, Co.,* 493 A.2d 929, 944 (Del.1985) (stating that materiality requires "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder"). Moreover, ALICO argues that the Delaware Chancery and Superior Courts defined a material fact as "one which a reasonable person would consider important in determining his course of action in the transaction in question." *Craft v. Bariglio,* No. 6050, 1984 WL 8207, at *8 (Del.Ch. Mar. 1, 1984); *Lock v. Schreppler,* 426 A.2d 856, 863 (Del.Super.Ct.1981).

ALICO has waived its right to object to the court's instruction on materiality be-

cause it did not object to the instruction before the jury began deliberations. When defendants' counsel proposed this instruction on materiality, Michael T. Sullivan, counsel for ALICO stated, "I don't have any objection to that, Your Honor." Tele. Conf. Transcript, Jan. 8, 1999, p. 42, 1.3. Furthermore, even if ALICO had objected, the court finds that its instruction on materiality does not warrant a new trial. Accordingly, the court will deny ALICO's motion for a new trial on this ground.

c. *Should the court grant ALICO's motion for new trial based on the jury instruction for duress?*

ALICO moves for a new trial on the basis that the jury instruction on duress was improper. As the court will grant ALICO's motion for judgment as a matter of law on duress, the motion for a new trial on this issue has become moot. Thus, the court need not address it further.

d. *Should the court grant ALICO's motion for new trial based on the court's failure to instruct the jury that Parra had a duty to read the General Release signing it?*

■ The next error that ALICO alleges in its motion for a new trial is that the court improperly declined to instruct the jury that Parra had a duty to read the General Release before signing it, and that his failure to do so precluded him from relying on any prior misrepresentations. ALICO contends that the Delaware Superior Court has held that where a party is aware he is signing a release and is not fraudulently prevented from reading it, he cannot rely on prior representations regarding the release. ALICO cites *Hicks v. Soroka,* 188 A.2d 133, 139 (Del.Super.Ct.1963), in support of this contention and argues that the court's failure to give a jury instruction on this issue was prejudicial error.

The court rejected ALICO's proposed instruction because defendants did not argue that Parra failed to read or understand the release. Defendants contend that the General Release is void because it was procured on the basis of fraud and duress. Even if Parra did not read or understand the release, he can still prevail on his defenses of fraud and duress. *See Pennsylvania Truck Line, Inc. v. Hendricks,* 1986 WL 3969, at *1 (Del.Super.Ct. Mar. 26, 1986) (holding that contract is void if defendant establishes that his "lack of knowledge is not due to his own negligence [in failing to read contract], but rather is a result of the fact that he was induced to assent to the agreement by either a fraudulent or material misrepresentation made by the plaintiff upon which he was justified in relying"). Therefore, the court's decision to omit the "duty to read" instruction proposed by ALICO was correct and ALICO's motion for new trial on this ground is denied.

e. *Should the court grant ALICO's motion for new trial based on the court's failure to instruct the jury that defendants were required to prove each element of their defenses by clear and convincing evidence?*

ALICO moves for a new trial on the basis that the court erred when it instructed the jury that defendants were required to prove each element of duress and fraud by a preponderance of evidence. ALICO contends that the burden of proof should have been clear and convincing evidence because defendants were seeking the equitable remedy of rescission. In support of its contention, ALICO cites *AOC Limited Partnership v. Horsham Corp.,* Civ. A. No. 12480, 1992 WL 136474 (Del.Ch. June 17, 1992).

The court has reviewed the jury instruction, and finds that it gave the correct instruction on the burden of proof in this case. Accordingly, the court will deny ALICO's motion for new trial on this ground.

2. *Should the Court Grant ALICO's Motion for New Trial Because Defendants Were Not Estopped From Raising Certain Arguments?*

The next error that ALICO alleges in its motion for new trial is that defendants

should have been judicially estopped from asserting facts at trial that were inconsistent with facts they asserted in arbitration. ALICO contends that during arbitration, defendants argued the General Release covered the entire network of agents associated with the four master general agents and that the consideration for the General Release was $127,000. ALICO argues that the court's failure to estop defendant from asserting inconsistent arguments at trial was prejudicial error.

 Under Delaware law, the party asserting judicial estoppel must have been misled by the inconsistent position of the party to be estopped and must have changed his position to his detriment. *Norman v. Paco Pharm. Servs., Inc.*, Civ. A. No. 10417, 1992 WL 301362, at *11 (Del.Ch. Oct. 21, 1992); *Brooke v. Elihu–Evans*, Civ. A. No. 95C–07–005–NMT, 1996 WL 659488, at *1 (Del.Super.Ct. Aug. 23, 1996). Furthermore, the party against whom estoppel is sought must have successfully obtained a judgment in its favor on the issue involved. *Norman*, 1992 WL 301362, at *11. The court finds that judicial estoppel does not apply in this case because defendants have not prevailed in the arbitration on any of the arguments they asserted. Accordingly, the court will deny ALICO's motion for new trial on this ground.

3. *Should the Court Grant ALICO's Motion for New Trial on the Basis that Improper Evidence Was Presented by Defendants?*

ALICO moves for new trial because the court allegedly allowed defendants to introduce improper evidence at trial. Specifically, ALICO argues: (1) that defendants improperly argued that failure of consideration was a basis for rescission; (2) that defendants presented improper evidence of alleged prior bad acts; (3) that defendants improperly argued that the jury would have to find the General Release void for Parra to proceed in arbitra-

tion; and (4) that defendants presented false evidence.

a. *Should the court grant ALICO's motion for new trial because defendants improperly argued that failure of consideration was a basis for rescission?*

ALICO argues that it is entitled to a new trial because defendants improperly argued at trial that failure of consideration was a basis for rescission. ALICO does not support its argument with any citations to the record and, after reviewing the record, the court finds that defendants did not make such improper argument. Rather, defendants argued that rescission was justified by ALICO's misrepresentations concerning the amount of consideration that Parra would receive for signing the General Release. Accordingly, the court will deny ALICO's motion for new trial on this ground.

b. *Should the court grant ALICO's motion for new trial on the basis that defendants presented improper evidence of alleged prior bad acts?*

 ALICO next argues that it is entitled to a new trial because defendants presented improper evidence of ALICO's alleged prior bad acts. ALICO contends that defendants introduced evidence of alleged violations by ALICO of the "general custom and practice" in the offshore insurance industry. Further, ALICO argues that the court should grant a new trial because defendants' called ALICO's chairman to the stand at trial solely to harass him.

After reviewing the record, the court finds that the testimony presented by defendants at trial was relevant to prove fraud and duress. Accordingly, the court will deny ALICO's motion for new trial on this ground.

c. *Should the court grant ALICO's motion for new trial on the basis that defendants improperly argued that the jury had to find the General Release void for Parra to proceed with arbitration?*

ALICO argues that the court should grant a new trial because defendants im-

properly argued that the jury would have to find the General Release void in order for Parra to proceed in arbitration. During closing argument, defendants' counsel stated: "You can help make sure they don't by finding for Mr. Parra, the defendant here. They'll be able to continue with the arbitration uninhibited by this General Release." The court overruled the objection by ALICO's counsel. After reviewing the record, the court finds that it was correct to overrule the objection and the court denies ALICO's motion for new trial on this ground.

### d. Should the court grant ALICO's motion for new trial on the basis that defendants presented false evidence?

ALICO contends that it is entitled to a new trial because defendants introduced false evidence at trial. Specifically, ALICO alleges that defendants presented false evidence of: (1) Parra's financial information in an income chart; (2) Parra's reliance on Fernandez's statements; (3) the alleged threat by ALICO as identified in Parra's Answer to the Complaint; and (4) Parra's relationship with Noel Ache. Even if ALICO's allegations with respect to this testimony were true, the court finds that they are, at best, harmless error and not grounds to grant a new trial. Accordingly, ALICO's motion for new trial is denied on this ground.

### 4. Did the court improperly prevent ALICO from seeking summary judgment?

ALICO next argues that a new trial is warranted because the court refused to postpone the trial three days before it was scheduled to begin in order to give ALICO time to file a motion for summary judgment. ALICO had planned to move for summary judgment on the basis that: (1) defendants were judicially estopped from asserting false representations regarding the scope of the General Release and the alleged failure of consideration; (2) defendants were barred from relying on any prior representations regarding the General Release; and (3) defendants were barred from asserting duress because there was no cognizable threat.

The court has already rejected the three underlying arguments that ALICO had planned to assert in its motion for summary judgment. Therefore, the court's refusal to delay trial to allow ALICO additional time to file a motion for summary judgment on these issues is not grounds for a new trial. Accordingly, the court will deny ALICO's motion for new trial on this ground.

### 5. Were defendants entitled to jury?

The final error that ALICO alleges in its motion for new trial is that the court should not have granted defendants' demand for a jury trial. ALICO contends that a jury trial was not warranted because it pursued equitable claims, to which no jury right attaches. On November 10, 1998, ALICO moved to strike defendants' demand for jury trial. Finding that defendants were entitled to a jury trial on their affirmative defenses of fraud and duress, the court denied ALICO's motion.

Even if, as ALICO argues, a right to jury trial did not exist, submitting the case to the jury is, at best, harmless error and not grounds for new trial. "A defendant has no constitutional right to trial by the court without a jury." *Hurwitz v. Hurwitz,* 136 F.2d 796, 798–99 (D.C.Cir.1943); *see also Great American Ins. Co. v. Johnson,* 25 F.2d 847, 849 (4th Cir.1928) (stating that right to jury trial is not involved when action at equity is mistakenly tried at law). With respect to fraud, the court finds that the jury reached the same result the court would have reached using its independent judgment, and therefore, use of the jury is not grounds for new trial. *See Dombeck v. Milwaukee Valve Co.,* 40 F.3d 230, 237 (7th Cir.1994); *see also Johnson,* 25 F.2d at 849 ("If the decision of the lower court in such case accords with what we deem the rights of the parties in equity, the error in trying the case at law should be treated as harmless, and the

judgment affirmed"). Accordingly, the court will deny ALICO's motion for new trial on this ground.

## III. CONCLUSION

For the reasons set out above, the court will grant ALICO's motion for judgment as a matter of law on the issue of duress. The court will deny ALICO's motion for judgment as a matter of law on the issue of fraud. The court will also deny ALICO's motion for a new trial.

The court will issue an order in accordance with this opinion.