

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-15-1995

# Gomez v Allegheny Health

Precedential or Non-Precedential:

Docket 94-1899

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Gomez v Allegheny Health" (1995). *1995 Decisions.* Paper 291.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/291

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 94-1899
_____

FERNANDO GOMEZ, M.D.,

Appellant

v.

ALLEGHENY HEALTH SERVICES, INC., a/k/a/ ALLEGHENY
HEALTH EDUCATION AND RESEARCH FOUNDATION; MEDICAL
COLLEGE OF PENNSYLVANIA; DEPARTMENT OF VETERANS AFFAIRS
MEDICAL CENTER, BERNARD SIGEL, M.D.; HOWARD A. ZAREN,
M.D.; PASCHAL M. SPAGNA, M.D.; STEVEN G. MEISTER, M.D.;
GLEN WHITMAN, M.D.; LESLIE A MILLER, ESQUIRE

Appellees
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civ. No. 92-5048
_____

Argued June 29, 1995

Before: HUTCHINSON*, ROTH, and WEIS, Circuit Judges

Filed November 15, 1995
_____


Richard J. Silverberg, Esquire (ARGUED)
Richard J. Silverberg & Assocs., P.C.
3700 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA  19103-2793

Attorney for Appellant


_____


* The Honorable William D. Hutchinson participated in the oral
argument and decision in this case, but died before he could join
or concur in this Opinion.

J. Freedley Hunsicker, Jr., Esquire (ARGUED)
Nadia Mykytiuk Jannetta, Esquire
Gregg R. Melinson, Esquire
Drinker Biddle & Reath
1100 PNB Building
1345 Chestnut Street
Philadelphia, PA  19107-3496

Attorneys for Appellees

Robert J. Gregory, Esquire
Equal Employment Opportunity Commission
1801 L Street, N.W.
Washington, DC    20507

Attorney for Amicus-appellant

_____

OPINION OF THE COURT
_____

WEIS, Circuit Judge.

In this appeal, a staff surgeon at a hospital asserts
that staff physicians refused to send patients to him because of
bias based on his national origin.  As a result of the lack of
referrals, the hospital did not renew the plaintiff's contract of
employment.  After a trial, the district court entered judgment
as a matter of law in favor of the hospital concluding that the
evidence failed to establish impermissible discrimination.  We
agree and will affirm.

Plaintiff, Dr. Fernando Gomez, M.D., brought suit
against the Medical College of Pennsylvania, five physicians on
the staff of the College, and two other defendants asserting
various causes of action, including claims under Title VII of the

3

Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and the Pennsylvania Human Relations Act, 4 Pa. Cons. Stat. Ann. § 951 et seq. (1995). The complaint alleged that plaintiff had been terminated from his services at the hospital because he was of Colombian extraction. Before trial, the district court dismissed the claims against all of the defendants except the College[1] and limited the counts against it to asserted violations of Title VII, the state Human Relations Act, and breach of contract.

The Medical College of Pennsylvania is an institution that combines teaching medical students with providing medical, as well as surgical, services to the community. Members of its faculty also practice medicine in their respective specialties.

Faculty members' salaries cover both their academic and clinical activities. The College uses the proceeds from the charges made for professional services both to defray the compensation and expenses of faculty members as well as to subsidize the costs of the teaching program. Inadequate income from patient treatment can become a serious problem for the academic facility.

During 1987 the College became concerned about the lack of referrals to the Division of Cardiothoracic Surgery. In an effort to increase the number of procedures performed by the unit, the College recruited Dr. Pascal Spagna, M.D., to become Chief of the Cardiothoracic Surgery Division and a member of the

---

[1]Both of the parties failed to advise the court of the status of the various defendants, requiring an extensive review of the district court's record to determine whether appellate jurisdiction existed.

permanent surgical staff.  His appointment led to improvement in the volume of patients being treated in the division.

In 1988, Dr. Spagna sought help to handle the increasing number of cases being referred to him.  He contacted plaintiff who was then on the surgical staff of another institution, to discuss plaintiff joining the staff and faculty at the College.  In addition to assistance in the surgery itself, Dr. Spagna was interested in having an associate who could take over post-operative care, a function Dr. Spagna did not particularly enjoy.  Apparently at some time before July 1988, Dr. Spagna extended an informal offer to plaintiff.

During the formal recruitment process, the Chairman of the Department of Surgery at the College, Dr. Bernard Sigel, M.D., Dr. Spagna's superior in the hospital and academic hierarchy, interviewed plaintiff.  Because the cardiology and cardiothoracic divisions work together so frequently, Dr. Spagna, as a matter of courtesy, invited Dr. Steven Meister, Chief of the Division of Cardiology, to meet with plaintiff.  Dr. Meister, however, was in the Department of Medicine and did not have any responsibility for hiring surgeons.

At the conclusion of the interview, Dr. Meister sent his appraisal of plaintiff to Dr. Spagna in a letter of July 21, 1988.  Dr. Meister emphasized that he would support Dr. Spagna's selection of a partner, whomever it was.  However, Dr. Meister expressed reservations about the small number of heart operations and internal mammary grafts [used in coronary artery bypass surgery] that plaintiff had performed during the preceding ten

5

years when he had been employed at a high volume surgical institution. Dr. Meister wrote that another concern was the plaintiff's "presentability." "He is a foreigner and both speaks and looks it. . . . I have some concerns that he may not be the guy who should walk into a patient's room first and discuss an operation, nor am I entirely comfortable that he is the man to be communicating with referring doctors after the surgery."

Dr. Meister then recommended Dr. Haji Shariff, M.D., who had performed well in surgery on the cardiologists' patients. Dr. Meister particularly noted Dr. Shariff's facility with the internal mammary approach. From the post-operative care standpoint, Dr. Shariff had been conscientious and had "earned the cardiology group's respect." The letter continued: "From the `presentability' standpoint, Haji is also a foreigner, but speaks and acts very American. In this respect he is very much ahead of Gomez."

The record does not disclose whether Spagna replied to these comments, but in a letter dated August 26, 1988, he and Dr. Sigel offered plaintiff a position in the Division of Cardiothoracic Surgery. If he accepted, plaintiff would report to the chief of that division and to the Chairman of the Department of Surgery. In addition, the College would appoint plaintiff to the position of associate professor.

The letter from Spagna and Sigel stated the offer was for a "full time, salaried position." It further read:

"D. A substantial financial advance is made by the Department of Surgery in funding this position, (i.e.,

6

[salary etc.]) and as a matter of sound financial policy, the amount so advanced is expected to be returned to the Department of Surgery from income resulting from clinical practice."

Plaintiff began his service at the College on September 12, 1988 as assistant surgeon to Dr. Spagna. Cases were referred by staff and outside cardiologists to the Spagna/Gomez team as the College's permanent cardiothoracic surgeons. Dr. Spagna usually decided whether he or plaintiff would be the primary surgeon, unless the referring physician requested otherwise.

In the period from July 1 to December 31, 1988, which included the two and one-half months when plaintiff worked with Dr. Spagna, eighty-five operations were performed, a larger number than had taken place during the preceding six-month period. In the following six-months, however, the Spagna/Gomez operations dropped from eighty-five to sixty-one. In the next six months, the number fell to fifty.

On February 12, 1989, a physician in the Department of Medicine, Division of Nephrology and Hypertension, wrote to Dr. Sigel as Chairman of the Department of Surgery, complaining about a consultation with plaintiff about a patient. The physician wrote that plaintiff "assumed an arrogant and offensive attitude on the telephone, lecturing and quizzing me as if I were a junior resident." On the back of this letter, Dr. Meister wrote: "Pat [Spagna]: This is, as you know, the latest of several complaints. I think you need to think about this long and hard." Dr. Meister finished with a postscript: "I personally don't

7

think it's a great idea for him to speak to referring d[octo]rs or conscious p[atien]ts."

On September 5, 1989, Dr. Meister wrote to Dr. Leonard Ross, Executive Vice Dean of the College, reporting some interpersonal conflicts with plaintiff and describing two recent unfavorable incidents. The first involved Dr. Nelson Wolf's patient who had been operated on the previous day. While making rounds, Dr. Wolf, the attending cardiologist, gave the patient a carotid sinus massage, a treatment that plaintiff later told the patient's family had caused a stroke. Dr. Wolf strongly disputed the plaintiff's cause and effect diagnosis, as did Dr. Meister.

The other incident involved a post-operative patient who had been discharged from the College and, on the same day, was admitted to another hospital with complications. The patient refused to return to the College for further contact with "Dr. Hitler," as he referred to plaintiff. Dr. Meister concluded that he and Dr. Wolf had "separately indicated to Dr. Spagna that we do not want Dr. Gomez involved with our patients -- at least while they are conscious."

Dr. Kevin Furey, M.D., a cardiologist not on the staff of the College, testified at trial that he refused to send patients to Dr. Spagna because of poor results in cases, and because on one occasion plaintiff refused to operate on a patient in an emergency situation.

Dr. Roger Marinchak, a staff cardiologist, testified that he, too, had been concerned about Spagna/Gomez surgical outcomes, and for that reason, no longer referred cases to them.

8

Moreover, plaintiff had dealt with Dr. Marinchak as if he were interfering with the patients. Dr. Peter Kowey, another staff cardiologist, also asserted that he had been dissatisfied with the morbidity and mortality results from the Spagna/Gomez team.

In addition, Dr. Kowey had a number of disagreements with the team about proper post-operative treatment of patients. Plaintiff, on the other hand, testified that he believed it was in the best interests of the patients for the surgeon to have the primary responsibility for post-operative care.

In September 1989, Dr. Sigel and Dr. Spagna both prepared glowing reviews of the plaintiff's professional competency and patient care. Dr. Sariel Ablaza, who also specialized in cardiothoracic surgery, testified that plaintiff was a competent "no nonsense" surgeon who believed that he, and not the cardiologist, should provide post-operative care for the patient. Dr. Ablaza also commented favorably on the plaintiff's presentations to residents at the College, saying that he was "very serious and is all business."

Plaintiff testified that in addition to the patients assigned to the Spagna/Gomez team, he took all cases coming from the trauma unit, approximately ten per year. At the beginning of his tenure, plaintiff and Dr. Spagna would alternate being the primary surgeon on other cases referred to the team. Later, Dr. Spagna said that he had been instructed by the referring physicians to do the surgery himself. Dr. Spagna told plaintiff that he hoped the situation would change. However, it did not.

9

Dean Ross was advised of the conflict between the Spagna/Gomez team and the cardiologists. Ross met with the Chairmen of the Departments of Surgery and Medicine, as well as Drs. Spagna and Meister in an unsuccessful attempt to resolve the problem. Dean Ross testified that the cardiologists felt "in all due professional conscience," that they could not refer cases to the Spagna/Gomez team because of mortality and morbidity results as well as poor communication. He also had been told by Dr. Meister that plaintiff had difficulty communicating and would become frustrated and speak very sharply to patients and their families.

Dr. Sigel left the position as Chairman of the Department of Surgery in October 1989 and was succeeded by Dr. Howard Zaren, M.D. Dean Ross told Dr. Zaren that he needed to strengthen the divisions that were weak in surgery. As a consequence, Dr. Zaren recruited new chiefs for neurosurgery, plastic surgery, and in March 1990, contacted Dr. Glen Whitman, a highly qualified individual, as a prospective chief for the Cardiothoracic Surgery Division.

During negotiations in the months following, Dr. Whitman made it clear that he would be unwilling to accept the position if it meant assuming financial responsibility for the Spagna/Gomez team. Dr. Whitman had not recruited them and wished to build his own unit.

At this juncture, the College was in a very difficult financial condition, and had just been acquired by Allegheny General Hospital of Pittsburgh. Dean Ross and Dr. Zaren decided

10

plaintiff had to be discharged, and that Dr. Whitman would take over as Chief of the Cardiothoracic Surgery Division following a six-month probationary period.  Dr. Spagna agreed to the realignment and also accepted a fifty percent reduction in his compensation.  He died unexpectedly in 1992.

In a June 26, 1990 meeting, Dr. Zaren and Dr. Spagna told plaintiff he was "going to be fired from the hospital after December 30 of 1990."  On the following day, plaintiff received a formal letter renewing his tenure for only six months.

After plaintiff requested a reason for his termination, Dr. Zaren wrote a letter stating that "because you have generated few, if any, new patient referrals to the Division of Cardiothoracic Surgery, it is not economically feasible for the Department to continue to exhaust its limited resources to employ you."  Dr. Zaren did, however, recommend the plaintiff's termination date be extended to June 30, 1991, and suggested that plaintiff use the additional time to seek new employment.  That effort, however, proved largely unsuccessful.

The case was submitted to the jury, which found on special interrogatories that plaintiff had proved "but for his national origin/race (Columbian) [sic], the Medical College of Pennsylvania (MCP) would have renewed his employment contract annually," and that his damages totaled $2,484,000.

In ruling on post-trial motions, the district court granted judgment as a matter of law to the defendant, observing that although plaintiff was of Colombian origin:  "No attempt was made to show that [plaintiff] had mannerisms which were thought

11

to be peculiar to Colombians."  The court commented that although the plaintiff's claim hinged entirely on the alleged animus of Dr. Meister, there was no evidence that he either directed or made an effective recommendation for the non-renewal of the plaintiff's contract.  "The only evidence is that Dr. Meister's superiors made the non-renewal decision, and as to them, no national origin discrimination animus is assigned."

In reviewing the testimony, the trial judge commented: "There is no evidence to rebut defendant's evidence that the cardiologists' decision to stop referring their patients for surgery to both Dr. Spagna and Dr. Gomez were, by each, an exercise of independent professional judg[]ment, made in the best interests of their particular patients."  The court concluded, "no rational jury could have found that MCP [the College] was motivated by anti-foreign/race animus toward the plaintiff."

Plaintiff has appealed, arguing there was sufficient evidence from which the jury could find that Dr. Meister did not refer patients because of discriminatory bias, and that he exercised his influence to have the College terminate the plaintiff's employment.  Plaintiff did not appeal the pre-trial dismissal of Dr. Meister and the other physicians.

12

I.

In reviewing the grant of judgment as a matter of law following a trial, an appellate court applies the same standard as the trial court. Rotondo v. Keene Corp., 956 F.2d 436, 438 (3d Cir. 1992). The question is whether, in viewing the evidence in the light most favorable to the losing party, no jury could decide in that person's favor. Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993)_"