**Joan ESHELMAN**

v.

**AGERE SYSTEMS, INC., formerly Lucent Technologies, Inc., Agere Systems Inc., Appellant.**

No. 05–4895.

United States Court of Appeals, Third Circuit.

Argued Dec. 13, 2006.

Filed: Jan. 30, 2009.

David S. Fryman (argued), William K. Kennedy, Ballard, Spahr, Andrews & Ingersoll, LLP, Philadelphia, PA, for Appellant.

Ronald H. Surkin (argued), Gallagher, Schoenfeld, Surkin, Chupein & DeMis, Media, PA, for Appellee.

Before: FISHER, CHAGARES, and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

CHAGARES, Circuit Judge.

Plaintiff/appellee Joan Eshelman (Eshelman) instituted a lawsuit against her former employer, defendant/appellant Agere Systems, Inc. (Agere) claiming, *inter alia*, that Agere discriminated against her in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213. At trial, Eshelman argued alternatively that Agere unlawfully discharged her because of her record of cancer-related disability, or because it regarded her as disabled. The jury found in Eshelman's favor, and awarded her back pay and compensatory damages totaling $200,000.00. Agere argues that there was insufficient evidence to sustain the jury verdict with respect to either theory of liability. Further, Agere argues that the District Court[1] improperly instructed the jury concerning "reasonable accommodation," and that the District Court improperly granted Eshelman's post-trial motion to augment the jury's award to offset the negative tax consequences Eshelman would incur from receiving a lump-sum back pay award. None of these four challenges has merit, and we will therefore affirm.

## I.

Eshelman was hired in 1981 by Western Electric, the predecessor company to Agere.[2] Over the next twenty years, Eshelman advanced through the company, eventually attaining a position of supervisor of the Chief Information Office of Agere's Reading, Pennsylvania facility. In 1998, Eshelman was diagnosed with breast cancer, and took a medical leave of absence from September 1998 until March 1999 while she was treated. Eshelman's doctor regularly submitted documents about her health and treatment to Agere's Health Services Department. Further, Eshelman herself kept both the Health Services Department and her supervisors, Joseph DiSandro and David Baily, informed about her condition. The Health Services Department maintained detailed entries entitled "Disability Information Notes" regarding Eshelman.

After her leave of absence, Eshelman returned to work on a part-time basis with the support of DiSandro and Baily. Upon returning to Agere, Eshelman advised DiSandro and Baily that she was suffering from a cognitive dysfunction resulting from her chemotherapy treatment for her breast cancer. Eshelman informed DiSandro and Baily that as a result of her

---

1. With the parties' consent, Magistrate Judge Timothy R. Rice conducted the proceedings in this matter. We refer to the Magistrate Judge as the District Court throughout this opinion.

2. Because this is an appeal from a jury verdict, we state the facts in the light most favorable to the prevailing party (here, Eshelman) based on the evidence introduced at trial. *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir.2003).

condition—colloquially known as "chemo brain"—she was struggling with short-term memory loss. The duration of this malady is indefinite. Here, it is undisputed that Eshelman suffered from memory loss well after she returned to work following her chemotherapy-related leave of absence. Eshelman was able to cope with her memory deficiencies by carrying a notebook and taking more notes than she had prior to undergoing chemotherapy. There is no record evidence that Eshelman's need to take additional notes adversely impacted her work performance or Agere's perception of her as a valued employee.

Several months after returning to work, Eshelman advised her supervisors that due to her memory problems, she was concerned about driving to unfamiliar places, which she had to do from time to time as part of her job. To compensate for her hesitancy about driving, Eshelman arranged to ride with other employees to meetings in unfamiliar locales, or alternatively to participate in such meetings by telephone. Despite these precautions, there were times when Eshelman lost her bearings while driving when she was going somewhere she "hadn't been for a while or someplace new." Appendix (App.) 10. When this occurred, Eshelman would pull over to the side of the road to get her "focus back." *Id.*

The parties agree that upon her return to work, Eshelman excelled at her job, as evidenced by her outstanding performance appraisals, promotions, raises, and bonuses. Though DiSandro completed Eshelman's performance appraisals, the appraisals included an overall assessment from both DiSandro and Baily. In 1999 and 2000, Eshelman received Agere's highest possible performance rating. And, in June 2001, DiSandro and Baily promoted Eshelman to a higher managerial position, which was accompanied by a $7,000.00 raise.

In October 2001, Agere suffered a substantial decline in profitability, and implemented a company-wide reduction in force almost immediately. Agere management apparently did not intend to close Agere's manufacturing operations in Reading, Pennsylvania in the initial stages of the restructuring; rather, they hoped to staff it more leanly. Ultimately, however, Agere's "Force Management Program" (FMP) led to the closure of Agere's Reading facility and the layoff of 18,000 employees worldwide. As part of Agere's FMP, Eshelman was selected for layoff effective December 30, 2001. Agere's administration of the FMP was the primary focus at trial.

Agere's FMP was designed to rank employees based on an objective assessment of skills that would be needed following Agere's corporate restructuring. Employees who scored below a certain level were identified as possible candidates to be laid off; those who were above the cutoff would remain employed following the restructuring. Consistent with his desire to retain Eshelman, and based on Eshelman's excellent performance history, DiSandro initially rated Eshelman highly, and also made efforts to shield Eshelman from termination by suggesting to Stephen Levanti, Agere's senior manager in charge of manufacturing, and Baily that in lieu of terminating Eshelman, Agere might be able to transfer her to a different Agere facility in the area.

When DiSandro broached the subject of a transfer with Eshelman, Eshelman expressed her concern about traveling to new locations given her memory problems. More specifically, Eshelman sent an email to DiSandro stating that she would "have trouble with the drive" without carpooling, explaining that "[s]ince my chemo my memory banks storing sense of direction are flawed—a fact I don't like to brag

about." App. 1038. Eshelman formalized her concerns by sending an email to DiSandro on October 26, 2001, citing: (i) increased commuting expense; (ii) hardship of daily commute, especially in bad weather; (iii) potential relocation expenses; (iv) her husband's need to remain in their current county of residence, Berks County; and (v) the potential for some telecommuting. Notwithstanding these concerns, Eshelman also stated her confidence in her ability to perform any job.

DiSandro discussed Eshelman's concerns with Baily and Levanti. At Baily and Levanti's direction, DiSandro changed Eshelman's FMP score from one of the highest scores of any Agere employee to one of the lowest. At trial, Baily testified that the change in Eshelman's score was based in part on Agere's perception that Eshelman would be unable to travel to Agere's Allentown and Breinigsville sites, a limitation Baily attributed to Eshelman's chemotherapy. Baily further testified that another factor that led Agere to change Eshelman's FMP score was its belief that Eshelman lacked "the ability to perform the job in Breinigsville and Allentown." App. 651. No one from Agere ever discussed either concern with Eshelman, or gave her any opportunity to address management's concerns after it altered her FMP score. Based on her adjusted, lower FMP score, Eshelman was placed at risk for termination, and was ultimately laid off effective December 30, 2001.

Subsequent to her termination, Eshelman filed suit against Agere, alleging discrimination on the basis of age and disability. Eshelman's disability claims asserted that Agere unlawfully slated her for termination based on its belief that her cancer-related memory problems would compromise her performance in the restructured company. More specifically, Eshelman asserted that Agere selected her for termination: (i) because Agere regarded her as having a disability; (ii) because she had a record of a disability; and (iii) in retaliation for Eshelman having requested an accommodation.

Following trial, the jury returned a special verdict form in which it determined: (i) that Agere did not discriminate against Eshelman on the basis of her age in violation of the Age Discrimination in Employment Act or the Pennsylvania Human Relations Act (PHRA); (ii) that Agere did not retaliate against Eshelman in violation of the ADA or the PHRA; but (iii) that Agere did discriminate against Eshelman in violation of the ADA and the PHRA. The jury did not specify the theory upon which it found Agere liable—i.e., whether it accepted Eshelman's "regarded as" disabled claim or her "record of" disability claim, or both. For these violations, the jury awarded Eshelman $170,000.00 in back pay and $30,000.00 in compensatory damages.

At the conclusion of Eshelman's case-in-chief and at the conclusion of all the evidence, Agere moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), which the District Court denied. Pursuant to Rule 50(b), Agere renewed this motion following the jury verdict, and alternatively requested a new trial pursuant to Federal Rule of Civil Procedure 59. Eshelman opposed Agere's motions and filed a motion for an additional monetary award to offset the negative tax consequences of receiving the back pay the jury awarded her in a single lump sum. On October 20, 2005, the District Court granted Eshelman's motion to augment her back pay award and denied Agere's motion to set aside the jury verdict. This appeal followed.

On appeal, Agere argues that the District Court erred: (i) in denying its renewed motion for a judgment as a matter

of law because there was insufficient evidence to support the jury's determination that Agere regarded Eshelman as disabled; (ii) in denying its renewed motion for judgment as a matter of law because there was insufficient evidence to support the jury's determination that Eshelman had a record of a disability; (iii) by improperly instructing the jury regarding Agere's alleged failure to accommodate Eshelman's disability; and (iv) by granting Eshelman's motion to grant her an additional monetary award to offset the negative tax consequences of her back pay award. We review each of these contentions in turn.[3]

## II.

[■■■] We exercise plenary review over the District Court's denial of judgment as a matter of law. *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 664–65 (3d Cir. 2002). In so doing, we apply the same standard as the District Court; that is, whether "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). Although judgment as a matter of law should be granted sparingly, we will grant it where "the record is critically deficient of the minimum quantum of evidence" in support of the verdict. *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir.1995). "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found

its verdict." *Id.* (citation omitted). Furthermore, "[i]n performing this narrow inquiry, we must refrain from weighing the evidence, determining the credibility of witnesses, or substituting our own version of the facts for that of the jury." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir.2007).

## III.

To prevail under the ADA, Eshelman must establish that she is a "qualified individual with a disability." 42 U.S.C. § 12112(a). The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C § 12111(8). The ADA defines "disability" with regard to an individual as either: (i) "a physical or mental impairment that substantially limits one or more of the major life activities of such [an] individual"; (ii) "a record of such an impairment"; or (iii) "being regarded as having such an impairment." 42 U.S.C. § 12102(2).

At trial, Eshelman did not contend that she was actually disabled within the meaning of the ADA at the time she was discharged; rather, she argued that her termination was based on Agere's belief that she was disabled, or alternatively on her record of impairment. As noted previously, the jury verdict form did not specify the particular theory on which its verdict was based. Agere argues that this lack of specificity is immaterial, as there was insufficient evidence to sustain either Eshel-

---

**3.** We have recognized that an "analysis of an ADA claim applies equally to a PHRA claim." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir.1999). Accordingly, we will limit our discussion to Eshelman's ADA claims

"because our analysis of th[ose] claim[s] is, under the circumstances of this case, coterminous with the PHRA claim[s]." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 n. 6 (3d Cir.2004).

man's "regarded as" disability claim or her "record of" disability claim.

## A.

We first consider whether Eshelman introduced sufficient evidence from which the jury could have reasonably concluded that Agere regarded her as disabled.

■ Under the ADA, a person is "regarded as" having a disability if she:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.

*Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 187 (3d Cir.1999); *see also* 29 C.F.R. § 1630.2(*l* ). As the District Court correctly concluded, Eshelman must demonstrate either: (i) that despite having no impairment at all, Agere erroneously believed that she had an impairment that substantially limited one or more of her major life activities; or (ii) that Eshelman had a non-limiting impairment that Agere mistakenly believed substantially limited one or more of her major life activities. *See Tice v. Ctr. Area Transp. Auth.,* 247 F.3d 506, 514 (3d Cir.2001) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). Thus, the relevant inquiry is whether Agere perceived Eshelman as disabled within the meaning of the ADA, not whether Eshelman was actually disabled at the time Agere decided to terminate her. *See Capobianco v. City of New York,* 422 F.3d 47, 57 (2d Cir.2005) ("A 'regarded as'

claim turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability.") (internal quotation marks and citations omitted).

■ Eshelman's perceived disability must, in any event, substantially limit a "major life activity." *Sutton,* 527 U.S. at 490, 119 S.Ct. 2139. The ADA does not define "major life activity," but Equal Employment Opportunity Commission (EEOC) regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); *see also Emory v. AstraZeneca Pharms. LP,* 401 F.3d 174, 180 n. 4 (3d Cir.2005) (deferring to definitions of terms used in the ADA as articulated in EEOC regulations). The parties disagree sharply over whether Eshelman introduced evidence from which a jury reasonably could have concluded that Agere perceived that she was substantially limited in a major life activity.

Eshelman asserted both at trial and on appeal that the jury could reasonably have concluded that although she had excelled at her job and was a highly valued employee, Agere nonetheless erroneously viewed her memory impairment caused by her chemotherapy treatment as substantially limiting two major life activities; namely, Eshelman's ability to think and her ability to work. It is undisputed that working and thinking qualify as "major life activit[ies]." *See* 29 C.F.R. § 1630.2(i) (working constitutes major life activity); *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d at 307 (construing thinking as a "major life activity").

This assignment of error therefore turns on whether the jury reasonably could have concluded that Agere regarded Eshelman as "substantially limited" in either or both

of these respects. With regard to working, the regulations state that an individual is "substantially limited" if there is a significant restriction in a person's "ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Accordingly, to prevail on her "regarded as" disabled claim under the ADA, Eshelman had to show that her termination was animated by Agere's belief that she was unable to work in a particular class or broad range of jobs, as required by the definition of "disability." *See* 42 U.S.C. § 12102(2)(A).

 The analysis is somewhat less clear with respect to thinking, as the regulations do not specify what degree of thinking impairment renders a person disabled. Nonetheless, it is logical to assume that a person may qualify as substantially limited when their inability to think (i) arises from a qualifying "physical or mental impairment"[4]; that (ii) compromises their ability to work, or causes their employer to believe that their ability to work is compromised. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d at 307 ("We think that most objections about the broadness of thinking as a life activity can be captured in the analysis of when the activity is substantially limited.").

 Agere makes two arguments why Eshelman cannot show that Agere viewed her as substantially limited in either respect. First, Agere argues that the evidence demonstrated, at most, that Agere perceived that Eshelman's chemotherapy rendered her unable to drive or to commute to work. Citing the numerous cases in which courts have held that driving is not a "major life activity" for purposes of the ADA, Agere asserts that Eshelman

failed to offer any evidence that Agere regarded her as being disabled to perform a major life activity. *See, e.g., Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir.1998) (holding that driving is not a "major life activity"). This argument fails, as it erroneously assumes the evidence the jury considered was limited to Eshelman's driving problems. While it is true that Baily testified at trial that Eshelman's inability to drive was one reason why Agere decided to change her score, his testimony makes clear that this was not the only reason. Indeed, Baily specifically identified other reasons Agere changed Eshelman's FMP score, including its concerns about Eshelman's "ability to perform the job in Breinigsville and Allentown [following the restructuring.]" App. 651; *see also* App. 673 (Baily testified a factor in her changed score was her "ability to function at the other two sites . . . ."). While it certainly would have been plausible for the jury to conclude that Agere's concerns about Eshelman's memory deficiencies were limited to her ability to drive to and from a new work location, the jury was by no means compelled to do so. To the contrary, the jury could just as easily have inferred, based on Baily's testimony, that Agere's concerns were broader, extending to Eshelman's ability to perform any job at Agere following the planned restructuring. Other than its own *ipse dixit*, Agere offers no reason why the jury would have necessarily been unreasonable to reach such a conclusion. Accordingly, we are unpersuaded by this argument.

Agere's second argument why we should set aside the jury verdict, insofar as it was based on a "regarded as" disabled theory, is that it would have been implausible for the jury to conclude that Agere believed that Eshelman was unable to perform her job duties adequately, given the amount of

---

4. *See* 29 C.F.R. § 1630.2(h) (defining "physical or mental impairment").

praise and accolades it lavished on Eshelman both before and after her treatment for cancer. Although the jury heard evidence that would support this argument, this evidence does not explain away Agere's avulsive change in Eshelman's FMP score. Based on Baily's testimony, it certainly would have been plausible for the jury to have concluded, notwithstanding Agere's opinion of Eshelman's past performance, that Agere believed that Eshelman's cancer-related memory problems would render her unable to perform any job at Agere going forward. As the District Court noted:

> The jury could have concluded Agere's perception of Eshelman's overall memory problems, not simply her difficulty learning driving directions to a new work site, effectively rendered Eshelman unable to perform any job at Agere. Eshelman's memory impairment was one of three factors that effectively precluded her from every job remaining under Agere's restructured operation outside of Reading. The jury's function was to determine whether Agere's non-discriminatory justification for Eshelman's lay-off was the actual reason; it determined it was not.

App. 21. We agree. Because Baily's testimony afforded the jury a sufficient basis to conclude that Agere slated Eshelman for termination based on its perception—whether accurate or not—that her cancer-related memory problems rendered her unfit for any job in Agere's restructured workforce, we must not disturb the verdict insofar as it is based on a "regarded as" disabled theory.

 Relatedly, the jury also had sufficient evidence from which it reasonably could have concluded that Agere viewed Eshelman's memory problems as a substantial limitation on her ability to think—a skill necessary to perform any job at Agere. In this respect, Eshelman testified that she tended to "go blank sometimes," that she sometimes needed to pull over to get her "focus back" while driving, and that she needed to take more notes than she had prior to undergoing chemotherapy in order to remember things. App. 167–68. The jury reasonably could have concluded from this testimony that Agere viewed Eshelman as having trouble thinking and remembering, not merely struggling with the physical act of driving. Put another way, the fact that Eshelman's memory problems manifested themselves most often in the context of driving does not preclude the inference that Agere feared that these problems would impede Eshelman from accomplishing other essential tasks following the restructuring. Indeed, Baily's testimony reflects exactly that. See App. 649 (noting that Eshelman's memory problems, which frequently manifested themselves during driving, "had an impact on [Agere's perspective] whether she would be able to perform one of the remaining jobs at Breinigsville and Allentown"); see also App. 669–70 (Baily's testimony that Agere based employees' FMP scores on the "skills . . . needed for the jobs going forward"). The District Court properly concluded that there was sufficient evidence that Agere regarded Eshelman as hindered in her ability to think. For all of these reasons, we hold that the District Court properly declined to set aside the jury verdict for lack of evidence that Agere regarded Eshelman as disabled.

**B.**

Agere next asserts that the evidence did not support a verdict that Eshelman established a record of her disability. We disagree.

 Congress included "record of" disability claims in the ADA to ensure that

employees could not be subjected to discrimination because of a recorded history of disability. *See, e.g., Sch. Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 284–85, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (discussing concept as applied to Rehabilitation Act claims); *Adams v. Rice,* 531 F.3d 936, 945–46 (D.C.Cir.2008) ("The 'record of' definition was tailor-made for plaintiffs who ... claim they once suffered from a physical or mental impairment that substantially limited a major life activity, recovered from the impairment, but nonetheless faced employment discrimination because of it."); *see also* 29 C.F.R. pt. 1630, app. § 1630.2(k) (explaining that the "record of" definition "protects former cancer patients from discrimination based on their prior medical history").

■ Here, Eshelman's "record of" claim required her to prove that she had a "history of, or [had] been misclassified as having, an impairment that substantially limited a major life activity." *Sorensen v. Univ. of Utah Hosp.,* 194 F.3d 1084, 1087 (10th Cir.1999) (citing 29 C.F.R. § 1630.2(k)); *see also Hilburn v. Murata Elecs. N. Am., Inc.,* 181 F.3d 1220, 1229 (11th Cir.1999). Eshelman also had to provide evidence that Agere relied upon her record of impairment in making its employment decision. *See Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 645 (2d Cir.1998); 29 C.F.R. pt. 1630, app. § 1630.2(k) (providing that "[t]his part of the definition is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment"). Of course, if the record at issue does not reference a disability or condition covered by the ADA, Agere is not liable even if it did rely on that record in making the adverse employment decision. *See Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship,* 209 F.3d 678, 683 (7th Cir. 2000) ("If [the plaintiff's] condition does

not rise to the level of a disability as defined by the [ADA], then she cannot recover even if [her employer] terminated her expressly because of her condition.").

■ This inquiry is fact-intensive and focuses on whether the plaintiff has submitted evidence that the actual extent of his or her impairment was substantial. *See Toyota Motor Mfg., Ky. v. Williams,* 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). The hypothetical or theoretical effects that such an impairment could have had on a similarly-situated person are insufficient to prove a "record of" claim. *See Sutton,* 527 U.S. at 483, 119 S.Ct. 2139; *Burch v. Coca–Cola Co.,* 119 F.3d 305, 317 (5th Cir.1997).

■ Agere argues that Eshelman did not present sufficient evidence at trial to succeed on her "record of" claim because "Eshelman did not demonstrate anything beyond a temporary inability to work, with no residual limitations." Agere Br. at 33. According to Agere, a mere absence from work, without more, cannot suffice to establish a record of an impairment that substantially limits a major life activity.

■ But Agere takes a too-narrow view of what was established at trial, and the conclusions that a jury could have rationally drawn from the evidence about Agere's decision to terminate Eshelman. Eshelman was, unquestionably, substantially impaired in the major life activity of working during her six-month absence for cancer treatment, and, just as clearly, Agere was aware of her cancer treatment and surgery. It is true that a relatively short-term absence from work, without any long-term impairment, is generally held to be insufficient to create a record of disability. *See, e.g., Colwell,* 158 F.3d at 646; *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 200 (4th Cir.1997); *Sanders v. Arneson Prods., Inc.,* 91 F.3d 1351, 1353–

54 (9th Cir.1996). In the instant case, however, Eshelman's actual period away from work was not the beginning, nor the end, of the evidence the jury heard regarding her record of impairment. First, the jury received extensive evidence from Agere's medical department's files on Eshelman, which documented her symptoms and treatment both before and after her time away from her job. In short, as the District Court found, "Eshelman kept Agere's Health Services Department's nurse informed of her health status, and her medical file recorded her cancer diagnosis and subsequent treatment with chemotherapy." App. 14.

Second, the jury heard evidence that Agere was notified that Eshelman had significant cognitive dysfunction after she returned to work. The evidence included a note to Agere written by her physician that discussed cognitive dysfunction resulting from chemotherapy treatments. *See* App. 1227–28. This dysfunction, referred to colloquially as "chemo brain," "can include deficiencies in verbal memory and psychomotor functioning," and the physician's note stated specifically that Eshelman had "particularly mentioned that she struggled with short term memory loss." App. 1227.

Third, Eshelman produced evidence that her direct supervisors, DiSandro and Bailey, were aware of her chemotherapy-related memory problems. *See, e.g.,* App. 166–67 (Eshelman's testimony regarding a meeting with DiSandro after her return to work, where as he described her job requirements and events that had transpired during her absence, "I told him that I would need to have a piece of paper and start to write this down as he was telling me about it. When he asked me why, I said . . . I have this problem that I can't retain things in my short-term memory."); App. 168 (Eshelman's testimony describing Bailey asking her to do something, "[a]nd at that moment, I didn't have paper with me, so I asked if he would give me a piece. And he did. And he said, can't you remember? And I said, no, I can't. I have to write this down, so that it doesn't disappear."). Paired with Eshelman's six-month absence and Agere's knowledge of her condition, this cognitive dysfunction permitted the jury to conclude that Eshelman had demonstrated a record of impairment that substantially limited her ability to think and work.[5]

Moreover, a reasonable juror could have concluded, from the evidence adduced at trial, that Eshelman's supervisors relied upon the record of Eshelman's cancer and subsequent treatment as a factor in her termination. *See* App. 651 (testimony that a reason for Eshelman's termination was "the ability to perform the job in Breinigsville and Allentown" due to her memory-

---

**5.** In its briefs and at oral argument, Agere argues that Eshelman's record of disability claim must fail because it is undisputed that Eshelman was not disabled within the meaning of the ADA at the time Eshelman selected her for termination. But this distinction is irrelevant. Eshelman has not asserted that she was actually disabled at that time; rather, she claims that Agere terminated her because of her documented history of cancer-related impairments that played a role in Agere's decision not to offer her a position in the restructured company. This view accords with the purpose of record of disability claims under the ADA, which is precisely to ensure that employees are not discriminated against on account of a properly documented history of substantial impairments. *See Adams,* 531 F.3d at 945–46; *Emory,* 401 F.3d at 182 n. 6 (implicitly distinguishing between ADA claim based on actual disability and claim based on "record of" disability); *Olson v. Gen. Elec. Astrospace,* 101 F.3d 947, 953 (3d Cir.1996) (same). Thus, it is immaterial for the purposes of her "record of" claim whether Eshelman was actually disabled at the time Agere terminated her.

based inability to travel); App. 673 ("Q: What were the deciding factors [in putting Eshelman at risk of termination]? A: The deciding factors [included] ... ' the ability to function at the other two sites on a— especially Breinigsville, on a regular basis."). A reasonable juror could certainly have concluded that this factor was substantial, as Agere apparently concluded that Eshelman's residual limitations would have precluded her from working effectively in any capacity at either the Breinigsville or Allentown locations. *See Sutton,* 527 U.S. at 491, 119 S.Ct. 2139 (stating that a person qualifies as substantially limited in a major life activity if she is "at a minimum ... unable to work in a broad class of jobs").

For the foregoing reasons, we hold that the evidence was sufficient to find that Eshelman provided a record of being substantially limited in the major life activities of working and thinking, and that Agere relied upon those limitations in its decision to terminate her.

 \* \* \* \* \* \*

Because Agere has failed to carry its burden to show that there was insufficient evidence to support the jury's verdict under either a "regarded as" or a "record of" theory of disability, we conclude that the District Court properly declined to set aside the jury's verdict.

### IV.

[■■■] Agere's third assignment of error is that the District Court improperly in-

structed the jury regarding ·Agere's purported failure to accommodate Eshelman and that the District Court should have granted Agere's motion for a new trial. The gravamen of Agere's argument is that because Eshelman did not state a failure to accommodate claim in her complaint, the District Court should have refused to give an instruction on such a claim. Insofar as Agere challenges only the District Court's decision to give the instruction-not the articulation of the legal standard contained in the instruction-we review for abuse of discretion. *United States v. Urban,* 404 F.3d 754, 779 (3d Cir.2005) ("Where the challenge to a jury instruction is a challenge to the instruction's statement of the legal standard, we exercise plenary review. Otherwise, we review challenges to jury instructions for abuse of discretion.") (citations and quotation marks omitted).

Agere's argument fails, as it mistakenly assumes that the District Court was instructing the jury on a failure to accommodate claim—an assumption squarely refuted by the trial transcript. At the charge conference, the District Court explicitly stated that it would define and discuss "reasonable accommodation," not because Eshelman had asserted a failure to accommodate claim, but because an understanding of the meaning of the term "reasonable accommodation" was critical to the jury's analysis of Eshelman's disparate treatment claims—claims Agere acknowledges Eshelman asserted.[6]

---

**6.** The transcript from the jury charge conference states in pertinent part:

> COUNSEL FOR AGERE: ... [W]hat I object to is any implication that there's a failure to accommodate claim here. It was never stated—
> THE COURT: I didn't say that. I say—I said, in instruction number one, part two, what the claim is in count two, and then I defined the elements in (pause)

> THE COURT: And the elements are in number five. She was otherwise qualified to perform with or without reasonable accommodations. That's B—that's—that's what we're doing. I'm just—I'm not saying there's a separate count on that. I'm not telling the jury that. I'm explaining what the terms are. And certainly, I think anybody who reads a transcript will find that the case was tried on a theory that's so

"Reasonable accommodation" is equally relevant to Eshelman's "record of" and "regarded as" disparate treatment claims. With respect to the former theory of liability, the plain text of the ADA makes clear that an understanding of "reasonable accommodation" is critical to understanding the scope of the ADA's prohibitions. *See* 42 U.S.C. § 12112(b)(5)(B) (defining discrimination under the ADA to include, inter alia, "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, **if such denial is based on the need of such covered entity to make reasonable accommodation** to the physical or mental impairments of the employee or applicant") (emphasis added). And, we have previously held that "reasonable accommodation" is relevant to a "regarded as" disability claim. *See Williams,* 380 F.3d at 775 ("[T]he conclusion seems inescapable that 'regarded as' employees under the ADA are entitled to reasonable accommodation in the same way as are those who are actually disabled."). For these reasons, we cannot say that the District Court abused its discretion in instructing the jury on the meaning of "reasonable accommodation."

## V.

Agere's fourth and final assignment of error is that the District Court improperly granted Eshelman's post-trial motion seeking an additional monetary award to offset the negative tax consequences of the back pay award. Eshelman argued that an additional award was warranted because the taxes she would have to pay on the lump sum award of back pay would be higher than what she would have paid had she received this pay in the normal course of employment (*i.e.*, in the absence of discrimination). Agere opposed the motion, arguing that there is no statutory or case law that supports this aspect of the District Court's decision.

■■■■ A chief remedial purpose of employment discrimination statutes such as the ADA is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *see McKennon v. Nashville Banner Publ'g Co.,* 513 U.S. 352, 358, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995); *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 796 (3d Cir.1985).[7] Congress armed the courts with broad equitable powers to effectuate this "make whole" remedy. *See* 42 U.S.C. § 2000e–5(g)(1); *Franks v. Bowman Transp. Co., Inc.,* 424 U.S. 747, 764, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Albemarle,* 422 U.S. at 418, 95 S.Ct. 2362. District courts are granted wide discretion to "locate 'a just result'" regarding the parameters of the relief granted in the circumstances of each case. *See Albemarle,* 422 U.S. at 424, 95 S.Ct. 2362 (quoting *Langnes v. Green,* 282 U.S. 531, 541, 51 S.Ct. 243, 75 L.Ed. 520 (1931)); *see also Taxman v. Bd. of Educ. of Piscataway,* 91 F.3d 1547, 1565 (3d Cir. 1996) (en banc).

■■■ In exercising its discretion to fashion a remedy, district courts should, *inter alia,* endeavor "to restore the employee to the economic status quo that would exist but for the employer's conduct." *In re Continental Airlines,* 125 F.3d 120, 135 (3d Cir.1997); *see McKen-*

---

intertwined that you can't carve this stuff out.
App. 725–26.

**7.** The ADA incorporates the remedies provided for in Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 12117(a); *Spencer v. Wal-Mart Stores, Inc.,* 469 F.3d 311, 315 n. 3 (3d Cir.2006). Accordingly, we will rely upon Title VII law to analyze the issue presented herein.

*non,* 513 U.S. at 362, 115 S.Ct. 879. One equitable remedy courts have employed to achieve this goal is back pay. *Loeffler v. Frank,* 486 U.S. 549, 558, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988); *Spencer,* 469 F.3d at 315 ("[W]e have treated back pay as a form of equitable relief awarded at the discretion of the court.").

▆▆▆ The Supreme Court made clear that back pay awards under discrimination statutes are taxable. *See Comm'r of Internal Revenue v. Schleier,* 515 U.S. 323, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995), *modified on other grounds by* The Small Business Protection Act of 1996, Pub.L. No. 104–188, § 1605, 110 Stat. 1838; *United States v. Burke,* 504 U.S. 229, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992), *modified on other grounds by* The Small Business Protection Act of 1996, Pub.L. No. 104–188, § 1605, 110 Stat. 1838. Further, "backpay awards are taxable in the year paid." *Robinson v. Se. Pa. Transp. Auth.,* 982 F.2d 892, 898 (3d Cir.1993). Accordingly, employees may be subject to higher taxes if they receive a lump sum back pay award in a given year. Put another way, receipt of a lump sum back pay award could lift an employee into a higher tax bracket for that year, meaning the employee would have a greater tax burden than if she were to have received that same pay in the normal course. This is the origin of Eshelman's argument that she should receive an additional sum of money to compensate for her added tax burden.

Though we have not directly addressed the precise issue before us, we do not write on a completely clean slate. In *Gelof v. Papineau,* 829 F.2d 452, 455 (3d Cir. 1987), the employer did not contest the conclusion that it would be liable for an additional award to compensate the employee for the additional taxes she would be required to pay as a result of her back pay award. The dispute before us was the size of the additional award. *Id.* Unsure of how the district court calculated the additional award, we vacated the award and remanded the case for further findings. *Id.* at 456. Accordingly, we declined to address whether such an award would be proper in cases where, as here, the parties disagreed as to whether an additional award should be granted. *Id.*

The Court of Appeals for the Tenth Circuit considered this issue in *Sears v. Atchison, Topeka & Santa Fe Ry. Co.,* 749 F.2d 1451 (10th Cir.1984). In that case, the district court awarded the employees in a Title VII lawsuit compensation for the additional tax liability incurred as a result of receiving seventeen years of back pay in a lump sum. *Id.* at 1456. The court of appeals, in considering the employer's challenge to this award, first recognized that "the trial court has wide discretion in fashioning remedies to make victims of discrimination whole." *Id.* While observing that such an award might not be appropriate in a typical case, the court held that it was appropriate in *Sears.* As a result, the district court's award was affirmed. *Id.; see also O'Neill v. Sears, Roebuck & Co.,* 108 F.Supp.2d 443, 446 (E.D.Pa.2000) ("Plaintiff is entitled to an award for negative tax consequences...") (Hart, Mag. J.); *E.E.O.C. v. Joe's Stone Crab, Inc.,* 15 F.Supp.2d 1364, 1380 (S.D.Fla.1998) ("[A] district court, in the exercise of its discretion, may include a tax component in a lump sum back pay award to compensate prevailing Title VII plaintiffs.").[8]

▆▆▆] We hold that a district court may, pursuant to its broad equitable powers

---

8. The Court of Appeals for the District of Columbia Circuit considered and summarily rejected the argument that a court could issue

an award to compensate an employee for additional tax liability in *Dashnaw v. Pena,* 12 F.3d 1112 (D.C.Cir.1994) (per curiam), *super-*

granted by the ADA, award a prevailing employee an additional sum of money to compensate for the increased tax burden a back pay award may create. Our conclusion is driven by the "make whole" remedial purpose of the antidiscrimination statutes. Without this type of equitable relief in appropriate cases, it would not be possible "to restore the employee to the economic status quo that would exist but for the employer's conduct." *In re Continental Airlines,* 125 F.3d at 135.

Support for our holding may be drawn from the now-universal acceptance of another form of equitable relief—prejudgment interest on back pay awards. *Loeffler,* 486 U.S. at 557, 108 S.Ct. 1965 ("[A]pparently all the United States Courts of Appeals that have considered the question agree, that Title VII authorizes prejudgment interest [on back pay awards]."). Prejudgment interest "serves to compensate a plaintiff for the loss of the use of money that the plaintiff otherwise would have earned had he not been unjustly discharged." *Booker v. Taylor Milk Co.,* 64 F.3d 860, 868 (3d Cir.1995); *see also Arco Pipeline Co. v. SS Trade Star,* 693 F.2d 280, 281 (3d Cir.1982) ("The purpose of prejudgment interest is to reimburse the claimant for the loss of the use of its investment or its funds from the time of the loss until judgment is entered."). We have acknowledged that "[a]s with the back pay award, prejudgment interest helps to make victims of discrimination whole." *Booker,* 64 F.3d at 868.

Similarly, an award to compensate a prevailing employee for her increased tax burden as a result of a lump sum award will, in the appropriate case, help to make a victim whole. This type of an award, as with prejudgment interest, represents a recognition that the harm to a prevailing employee's pecuniary interest may be broader in scope than just a loss of back pay. Accordingly, either or both types of equitable relief may be necessary to achieve complete restoration of the prevailing employee's economic status quo and to assure "the most complete relief possible." *Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.,* 478 U.S. 421, 465, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); *see also Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 850–54, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001) (recognizing "front pay" as an equitable remedy authorized under Title VII); *Franks,* 424 U.S. at 766, 96 S.Ct. 1251 ("It can hardly be questioned that ordinarily [the equitable relief of restoration of seniority] will be necessary to achieve the 'make whole' purposes of [Title VII].").

Having determined that a district court may award a prevailing employee an additional sum of money to compensate for the increased tax burden a back pay award may create, we now review whether the District Court erred in granting such relief in the present case. In support of her motion for relief, Eshelman submitted an affidavit from an economic expert who calculated the amount of tax-effect damages based upon the back pay award, the applicable tax rates, and Eshelman's income tax returns for the appropriate years. The District Court granted Eshelman $6,893.00 to compensate her for the negative tax

---

seded in part by 29 U.S.C. § 633a(d). The entirety of the discussion of this issue in the court's per curiam opinion is as follows:

> Absent an arrangement by voluntary settlement of the parties, the general rule that victims of discrimination should be made whole does not support "gross-ups" of backpay to cover tax liability. We know of

no authority for such relief, and appellee points to none. Given the complete lack of support in existing case law for tax gross-ups, we decline so to extend the law in this case.

*Id.* at 1116. For the reasons stated herein, we disagree with *Dashnaw.*

consequences of receiving a lump sum back pay award. Agere did not rebut the affidavit of Eshelman's economic expert and does not dispute the accuracy of the figure awarded by the District Court. Agere's sole argument for reversal was that the District Court was without legal authority to grant the award. Having reviewed the record, we hold that the District Court did not abuse its discretion in awarding Eshelman $6,893.00 as compensation for the negative tax consequences of receiving her lump sum back pay award.

We hasten to add that in so holding, we do not suggest that a prevailing plaintiff in discrimination cases is presumptively entitled to an additional award to offset tax consequences above the amount to which she would otherwise be entitled. Employees will continue to bear the burden to show the extent of the injury they have suffered. The nature and amount of relief needed to make an aggrieved party whole necessarily varies from case to case. Accordingly, district courts, in using their wide discretion to "locate 'a just result,'" *Albemarle,* 422 U.S. at 424, 95 S.Ct. 2362 (quoting *Langnes v. Green,* 282 U.S. 531, 541, 51 S.Ct. 243, 75 L.Ed. 520 (1931)), should grant relief "in light of the circumstances peculiar to the case." *Id.; see generally Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.").

### VI.

For the foregoing reasons, we will affirm the decision of the District Court in all respects.